OPINION OF THE COURT
Paula J. Hepner, J.
Before the court are cross petitions for custody of Luis M., the first filed by the father on March 1, 2007 and the second filed by the mother on March 13, 2007. Trial of the issues began on October 24, 2007 and concluded on October 25, 2007. Each of the parties testified in their own behalf and Victor M. called his mother, Antonia R., as a witness. In addition the mother introduced into evidence 11 photographs consisting of pictures of her mother’s home in Florida, where she would reside for the immediate future, and pictures of various family members with the child taken at the second birthday party they had for him this summer.
Because the child was 20 months old at the time the petitions were filed and neither party expressed concerns regarding the other’s mental health or fitness,[1] the parties waived the appointment of a law guardian[2] and a forensic evaluation.[3] The appellate rulings in this Department and others hold that the ap *652 pointment of a law guardian is discretionary, not mandatory (Matter of Weis v Rivera, 29 AD3d 812 [2d Dept 2006]; Matter of Cole v Reynolds, 8 AD3d 703 [3d Dept 2004]; Matter of Cinquemani v Guarino, 243 AD2d 562 [2d Dept 1997]). The Court of Appeals held in Richard D. v Wendy P. (47 NY2d 943, 944-945 [1979]), a case involving a three-year-old child, that “[t]here is no requirement that the court invariably appoint a Law Guardian for the child in every case where parents who are unmarried, divorced or separated, seek a judicial determination of child custody and there is no indication that the child’s interests [would be] prejudiced in any way.” Failure to appoint a law guardian where the children were the tender ages of two and four did not warrant a reversal of the court’s custody determination when no demonstrable prejudice was shown (Lee v Halayko, 187 AD2d 1001, 1002 [4th Dept 1992]). The rulings of the Second Department are consistent with this principle (Jackson v Jackson, 31 AD3d 386 [2d Dept 2006]; Matter of Smith v DiFusco, 282 AD2d 753 [2d Dept 2001]).
Just as the Second Department has recognized that the appointment of a law guardian is not required in all cases, so has it recognized that forensic evaluations may not be necessary in all custody and visitation litigation (Guevara v Guevara, 132 AD2d 596 [2d Dept 1987]). The decision of “whether to direct a social or psychological evaluation in custody and visitation matters is within the sound discretion of the court” (Matter of Sassower-Berlin v Berlin, 31 AD3d 771, 772 [2d Dept 2006]; Matter of Salamone-Finchum v McDevitt, 28 AD3d 670 [2d Dept 2006]). The Family Court is not required sua sponte to order psychological assessments (Matter of Thompson v Yu-Thompson, 41 AD3d 487 [2d Dept 2007]; Matter of Panetta v Ruddy, 18 AD3d 662 [2d Dept 2005]; Lee v Halayko, 187 AD2d at 1002).
Notwithstanding the parties’ waiver, the court independently assessed the information available pretrial to determine whether a law guardian should be appointed sua sponte. The court’s analysis suggested that a law guardian would not be critical in this case because the child is preverbal, does not have special medical or health-related needs, is not developmentally delayed and in need of therapeutic interventions or special education services, the parties have been cooperating in jointly raising the child despite the demise of their relationship and no issues pertaining to inadequate supervision and guardianship, impaired judgment, mental health or domestic violence were raised by either party. The court also independently assessed the informa *653 tion available pretrial to determine whether a forensic evaluation should be ordered sua sponte (Matter of Panetta v Ruddy, 18 AD3d at 662). After analyzing the circumstances of the parties and noting the absence of particular issues that might otherwise warrant a more in-depth inquiry, the court concluded that a forensic evaluation was not essential to make the custody determination herein (Matter of Hernandez v Rodriguez, 42 AD3d 498 [2d Dept 2007]) since neither the parties nor the child displayed emotional problems that would render the assistance of a court-appointed psychologist necessary (Mascoli v Mascoli, 132 AD2d 653 [2d Dept 1987]), there are no factual allegations that warrant ordering a forensic evaluation (Guevara, 132 AD2d at 596), and the evaluation was not requested by the parties nor was it “necessary in order for the court to resolve the custody issue” (Matter of Diaz v Santiago, 8 AD3d 562, 563 [2d Dept 2004]).
At the end of the trial, counsel delivered oral summations on behalf of their clients and submitted case law in support of each party’s position. Decision was reserved in order to give the court an opportunity to review the testimonial and documentary evidence in the record and to consider the points and authorities cited by counsel.
Findings of Fact
The court, having had the unique opportunity to hear the testimony of the witnesses, observe their demeanor, and assess their veracity, now makes the following findings of fact based on the material, relevant, credible and competent evidence in the record.
The mother was born and raised in Tampa, Florida, where she lived with her mother and father until she was 17 or 18 when her parents divorced. She continued to live with her father until she was 22 and got her own apartment. The father was born in Puerto Rico and raised in the Bronx. He has been living in New York for the past 10 years. At present they are each in their mid-twenties. The parties met on line in 2002 and corresponded for a short while until they exchanged phone numbers and began talking on the phone a few times a week. This continued for a few months until they actually met in person when the mother came with a friend to New York in May 2002 on a four- or five-day vacation. According to the father they “met up one night to hang out, have a couple of drinks” after which “she went her way and I went mine.” After the *654 mother returned to Florida, the parties continued to speak over the telephone. In May 2004, the mother invited the father down to Florida for the weekend and he went. According to the mother they “hit it off’ and their relationship became intimate. Between May 2004 and January 2005, the mother came to New York three or four times to visit the father. They would have drinks, go to the movies and spend time together. Over one Christmas holiday, she met the father’s mother and brother. At some point during their relationship, the parties made the decision to have a child together.
In October 2004 the mother learned she was pregnant. That same month, the father took his two-week vacation and went to Florida to be with the mother. He brought his daughter Victoria with him. They discussed the possibility of him moving to Florida so, while he was there, he looked for a job in maintenance by posting his resume on a Web site and checking the local newspapers. The father got a “couple of calls back” but when he went to be interviewed with the Hillsboro County schools for a job as a locksmith, he was told he was “too overqualified” when they saw he was making $17 an hour at his job in New York[4] and they were offering only $10 an hour. Though he said he would start at any entry level, he was not offered the job.
At the end of October 2004 the mother was terminated from her job as a general claims clerk at MetLife in Florida for taking more time off than her allotted annual leave would cover. Although the father admitted they had “plans to move out there,” after she lost her job, he told her they would live better in New York since he “had a stable job and stable home, [his] mother would provide childcare, the baby is young and can’t talk and [he would not] trust anyone but family to care for [their] son.” The mother “never wanted to move here to begin with” but agreed to do so because she “felt that it would be only temporary” since they would “save money for a house and move back to Florida.” The mother admitted that the father never gave her an exact time frame but in her mind it would be “within a few years.”
*655 In January 2005, the mother moved to New York and began living in the father’s apartment with him and his seven-year-old daughter Victoria. In June 2005, she brought her 11-year-old daughter Ashley to live with them. Their child, Luis, was born on July 7, 2005. As the mother was not working, the household was supported entirely by the father’s salary, money “left over” from her income tax refund, and $100 which her father sent to her “here and there.” The father worked on weekends to earn overtime pay while the mother was unemployed. The father acknowledged that, at the time the mother moved to New York, the plan was to “pay up his bills” and save money so they could buy a home in Florida. According to the father, the mother understood he had bills to pay and she did not deny this fact. Because of their expenses, they never started a savings account, were unable to put aside money for a house and the plan never materialized. Once the mother gained employment, the father testified he only worked overtime “once in awhile” because he did not need to earn as much money to support them and preferred to spend time with his son, daughter and family.
The mother began working in October 2005 two months after the birth of their child. She works five days a week at Midtown Glass where she earns $20,800 a year working “half on the books and half off.” She got the job through the father’s brother. She has a high school diploma and sought work in New York by posting her resume on Monster.com. She hoped to be able “to move up and make more money” but the one job she was offered did not pay much money. Because of her work at MetLife in Florida, she made applications to insurance companies in New York. She had an interview at New York Life but it was for selling insurance where she “would not get paid until she put herself through their training program.” She also has past experience in banking and applied to several banks, including Commerce Bank and Chase-JP Morgan, but did not get employment. Professing to being interested in becoming a technician in the health field “doing sonograms and x-rays” or doing paralegal work, the mother admitted discussing this with the father and he told her “if that’s what you want to do, then do it.” However, she did not explore any of these training programs in New York City because she “had [her] daughter here and [didn’t] want to leave total responsibility for her on his mother or him.”
Once the mother began to work the paternal grandmother, Antonia R., took care of the children, as she had done for her *656 granddaughter Victoria before the mother, Ashley and Luis arrived. Ms. R. has raised Victoria since she was little, caring for her in Manhattan while both of her parents worked and then caring for her in Brooklyn after her son obtained custody. The mother and father have an indefatigable and infinite resource in Ms. R. who comes to their home at 6:30 a.m. and leaves at 7:00 p.m. during the school year as well as the summer recess. Ms. R., with Luis, takes Victoria to school and then she returns home to make breakfast for Luis. When the mother’s daughter Ashley was living in New York, she also took Ashley to and from school. If it is nice outside, she and Luis go to visit her daughter-in-law and other son, who both live in nearby residences, where Luis has the opportunity to play with other children. When Ms. R. leaves there, she and Luis return home where she gives him lunch, a bath and a nap. She and Luis go out again to pick up Victoria after school after which she returns home to cook the evening meal for everyone. Ms. R. babysits for the father and mother in the evenings if they have to go out, if the mother has to go to a doctor or if the father has to work overtime. She does not charge them anything because “they are my grandchildren.” According to Ms. R., the father’s family is incredibly close-knit. They celebrate holidays and birthdays together and spend time together regularly. Ms. R. testified that they invite the mother to their celebrations, parties, picnics and barbeques but sometimes “she has an excuse that she doesn’t have clothing or something” and doesn’t attend.
The mother has been in New York since 2005. Other than an older half sister who lives in Massachusetts, the mother has no family here. The mother and her sister are not close as they did not grow up together and they met for the first time when the mother was 17. The mother does not have any friends in New York. Besides Victor M. and Antonia R., she has no one here to turn to for emotional support. The father acknowledged the mother’s friends were in Florida but said for reasons he did not know, she didn’t stay in contact with them. After the mother came to New York and became homesick, the father portrayed her as sad and withdrawn. In describing the course of their relationship, the mother said it was very loving at first but there were times when she felt homesick. The stress of being pregnant and later trying to find a job caused the mother to become “somewhat withdrawn and over time, the relationship faded.”
The father offered to introduce the mother to people and his family offered to take her out but he said she did not want to *657 go. When asked about her relationship with the father’s family, the mother admitted that she felt accepted by them, never criticized by them and was welcomed into the family when she came to New York. She agreed the father’s family invited her and her daughter to attend family gatherings, holiday celebrations, birthday parties and remarked that although she gets along with everybody, she generally “just keeps to [herself], going to work, coming home.” She explained that “if we see each other we say ‘Hi’ or ‘How are you?’ ” but she does not seem to have adopted them as a surrogate family. When asked how often she goes out she replied, “never except to go to the supermarket.” Other than going to work, the mother does not have any outside interests or hobbies nor does she participate in any recreational activities or classes. She never looked on line to find any neighborhood social groups for young mothers nor did she check the community calendars on cable television for programs or activities she could attend and make friends. She also never used the Internet to look up free or low cost activities for herself and the children because she does not know her way around New York. The mother admitted she would ask the father to watch the baby if she wanted to go out and was sure the father would not refuse to watch the baby but she never asked him since she “did not actually have the opportunity to go out.”
In contrast to the lonely and isolated life she leads in New York, all of the mother’s relatives reside in Florida — each of her parents and stepfather, two uncles, an aunt, a grandmother, first cousins and their children. According to both parties, the mother speaks to members of her family on the telephone everyday, particularly her mother, stepfather and father. Although the mother professes to have a close family, none of her relatives have ever come to see her in New York. Only once did one of her best friends come to see her in New York. When the father was visiting the mother in Florida in October 2004 she never took him to meet her family. According to him, “the only time we visited her parent’s home was on [the], day we decided to leave.”
Because the mother is homesick, she wants to leave New York with her child and return to Florida “to be with my family.” She would live for free with her mother and stepfather in a three-bedroom, two-bath home located between 30 and 40 miles from Tampa in a town called Zephyr Hills. The home is located on “one acre of land that is fenced in” and has a big backyard, *658 which her apartment in New York does not have, where her son could play. The mother expects to find employment in Tampa which would be a 30-minute drive, one way, using one of her parents’ cars. Once she gets a job, childcare would be provided to her without cost by her stepfather who is retired and her mother who works at night.
In addition to being reunited with her family, the mother’s other reasons for wanting to move to Florida are to have a better environment to raise the child in, to have the support of her family, to get a better paying job and advancement in a company as opposed to the job she has now, to be able to go at night to career advancement programs and to be able to afford a three-bedroom two-bath apartment. She claimed to have found such an apartment for a monthly rent of $750 to $850 not including utilities. In addition, she would have expenses of telephone, cable, food and gasoline. In contrast to this figure, the apartment she and the father live in presently costs $1,165 per month, which he and she presently divide. Because the mother does not “know where anything is in Brooklyn” and in Florida “she would have [her] own vehicle,” the mother believes there are more recreational opportunities for her and her children and she “would be able to take them more places” in Florida. When asked if she planned to look for a job in Florida, the mother replied that she “had job offers already” but on cross-examination she admitted that while she “got call backs for wireless communications and insurance companies” for full-time jobs in customer service paying between $12 and $15 an hour with medical benefits, she actually had only offers of interviews which she was not able to go to while residing in New York.
The mother testified that her wish to return to Florida was “absolutely not” motivated by a desire to deprive the father of meaningful access to the child. She said that when she and the father broke up in February, she “just felt that the only place I could go is back home.” She denied starting up a new relationship with someone in Florida. She acknowledged that if she was allowed to have the child and move to Florida it would make it difficult for the father to have access. She expressed her willingness to permit the father to have “significant visitation” with the child by giving him “a large chunk of time to spend with him . . . including holidays and summers.” She said she would be “very flexible” and allow him to “spend as much time as he can, six to eight weeks during the summer.” She volunteered to *659 pay the cost of her plane ticket and half of the baby’s to bring the child to New York for visitation. If the father were to fly down to Florida, the mother said he could see the child anytime he wanted to come, as often as he wanted to come, from the time he arrived until the time he left. Although this two year old says “some words,” she would not oppose the father calling him every day to talk on the telephone. She would provide a videocam for the father and child to communicate visually with each other over the Internet.
The mother acknowledged that it would be an “abrupt change” for the child to be away from the only home and family[5] he knows and where he sees his father every day but said the child “is only two and he can grow up knowing his father.” If the mother were permitted to have the child but not allowed to move to Florida, she said her plan was to stay here. She would like the father to have “alternate weekends as well as one day during the week overnight” and shared holidays. When asked what her plan for day care would be while she worked, she said she “would hope his mother would be able to continue to watch him for me, otherwise I would put him in day care” but she acknowledged she would “have no idea how to pay for it.” Admitting that the child is close to the paternal grandmother, she would prefer him to be with her. When Ms. R. testified, she offered to continue donating her time to care for her grandson along with Ashley if she were to live in New York with her mother.[6]
The father’s family consists of two brothers and a sister. One brother lives two blocks away from him with his wife, two-year-old son, and Antonia R. His other brother, with whom he also works, lives 10 to 15 blocks away with his wife, and his six- and seven-year-old daughters. His sister lives in New Jersey whom he sees mostly on holidays and birthdays. When asked how he felt about his siblings, the father said he has “good relationships with them and he would be there anytime for them.” The *660 father testified that the parties live in a residential neighborhood where it is quiet after midnight and “once in a blue [moon] a car gets broken into.” Coney Island is down the block and the aquarium and Prospect Park zoo are not too distant. The neighborhood McDonald’s has a play space and a place where there are toddler rides. When asked how he spends his time with the child, the father said if it is a nice day he takes him to the corner store where they get a lollypop or he takes him to a downstairs neighbor who has a daughter the same age where they can play together. The mother admitted the father spends time with the child when he is not working on weekends and plays with him in the evening after work until the child goes to sleep. The mother said the father goes out occasionally leaving the child home alone but when asked to explain what she meant, she said maybe three times a week he goes downstairs to hang out with a friend in front of the building. When asked about what tasks each parent does, such as changing diapers, bathing and feeding the child, playing with him, putting him to bed, the answer both parents gave is “we both do.” The mother even acknowledged that the father is an equal partner in toilet training their son which they have just begun.
The father explained that “once she told me she wanted to leave and that we were splitting up,” he came to court to file for custody and to stop the mother’s relocation because “I love my son, I had him since he was born, I’ve always been there for him . . . and I want to remain in his life.” The father explained that it would not be fair for the mother to move out of state because he is used to having the child with him all year round and he would not be able to spend as much time with the child as he would if she remained here. When asked what he thought about the mother’s visitation proposal if she was permitted to relocate, the father said “right now it sounds like it is fair but when my son starts school and[the] whole plan changes ... I would have to try to have as much visitation as I could.” He admitted that any time parents split up, someone loses out on time with the children and that would be the case even if the mother stayed here. The father said that if the mother stayed here, he would want to see the child “every day if I can and spend a couple of hours with him.” While saying he did not agree with the mother’s proposed visitation plan if she remained in New York, he added, “me and her have a close relationship and we can work something out.”
*661 Conclusions of Law
The court, having reviewed the applicable judicial precedents pertaining to the custody/visitation issues at bar and having considered the arguments, points and authorities cited by counsel in their summations, now reaches the following conclusions of law based upon the material, relevant and credible facts established at the hearing.
This fact pattern is one of the most unusual this court has seen in 17 years on the bench. To begin with, there is almost no discrepancy between the parties’ factual recitation of their history together and their present circumstances. Even though they did not marry, both parties admit they decided to have a child together. After the child was born, the parties agree that they have been equal partners in caring for and raising him. Neither party has anything bad to say about the other, nor does one party harbor any resentments toward the other. Theirs is not a high-conflict dissolution riddled with daily dramas emerging from perceived injustices or unseemly conduct. Each considers the other to be an excellent parent, fully engaged with the child and fulfilling the duties of childrearing and accepting the responsibilities of parenthood. Neither party has made any allegation of physical or verbal abuse against the other party. Despite having lost the love they once had, the parties continue to reside together as a family unit; consequently the primary custodian has not been determined de facto or by court order. The mother, feeling isolated in New York and homesick for her family in Florida, desires to return and seeks custody so she may take the child with her. The father, who objects to losing his daily involvement and interaction with the child, opposes the mother’s relocation and seeks custody as an alternative. While each party is quite young, they have approached their situation in a mature and responsible way by coming to court and seeking a judicial determination of the issues they are unable to resolve for themselves.
Under New York law, priority in a custody dispute should be given to the first parent who was awarded custody, either by voluntary agreement or court order, unless extraordinary circumstances require otherwise (Friederwitzer v Friederwitzer, 55 NY2d 89 [1982]; Matter of Ganzenmuller v Rivera, 40 AD3d 756 [2d Dept 2007]) because stability and continuity are vital to normal child development (Matter of Nehra v Uhlar, 43 NY2d 242 [1977]). Inasmuch as neither party has lost his or her status as a custodial parent, neither parent can assert a priority under *662 Friederwitzer. Because this case requires an initial custody determination, it “cannot properly be characterized as a relocation case” (Matter of Spencer v Small, 263 AD2d 783, 785 [3d Dept 1999]). Accordingly, the mother’s “desire to move the child[ ] out of State [is] ... a relevant factor to be considered by Family Court in connection with its ‘best interests’ analysis” (Matter of Buell v Buell, 258 AD2d 709, 709 [3d Dept 1999]), and will be analyzed in accordance with the holding of Matter of Tropea v Tropea (87 NY2d 727 [1996])[7] and the factors set forth therein.[8]
A. Best Interests
It is the public policy of this State, as set forth in section 70 (a) of the Domestic Relations Law, that neither parent has a *663 prima facie right to custody. In Meirowitz v Meirowitz (96 AD2d 1030, 1030 [2d Dept 1983]), the Second Department reiterated the standard set by the Court of Appeals to be applied by the trial courts in making an initial custody determination, that is, that “the paramount concern in all custody matters is the best interests of the child” (Eschbach v Eschbach, 56 NY2d 167 [1982]; Miller v Pipia, 297 AD2d 362 [2d Dept 2002]). To determine what is in the best interests of the child, courts are required to evaluate the “totality of [the] circumstances” (Assini v Assini, 11 AD3d 417, 418 [2d Dept 2004]). Factors to be considered include
“the quality of the parents’ respective home environments, the length of time of the existing custody arrangement, the parents’ past performance and relative fitness, their ability to guide and provide for the child’s intellectual and emotional development, the needs of the child, the child’s wishes, as well as any possible manipulation of those wishes, and the need for stability in the child’s life” (Matter of Grayson v Fenton, 13 AD3d 914, 915 [3d Dept 2004]; Matter of Nehra v Uhlar, 43 NY2d 242 [1977]).
Of relevance are “the financial status and ability of each parent to provide for the child” (Matter of Canazon v Canazon, 215 AD2d 652, 653 [2d Dept 1995]) and “ ‘the effect that an award of custody to one parent might have on the child’s relationship with the other parent’ ” (Bains v Bains, 308 AD2d 557, 558 [2d Dept 2003]). Because these factors interact with each other to create “a complex picture of each parent’s living situation and the quality of care that they will provide, no single factor is dis-positive” (Synakowski v Synakowski, 191 AD2d 836, 836 [3d Dept 1993]). By statutory amendment to Domestic Relations Law § 240 (1) (a) courts must also consider the “effect of . . . domestic violence upon the best interests of the child” if a party makes a sworn allegation that “the other party has committed an act of domestic violence against the party making the allegation or a family or household member of either party, . . . and such allegations are proven by a preponderance of the evidence.”
Three of the foregoing factors (the present custodial arrangement, the child’s wishes and the existence of domestic violence) are not at issue in this determination. The evidence shows that in the remaining comparative categories (the respective home environments, the needs of the child, each parent’s past performance and relative fitness, each parent’s ability to guide and provide for the child’s intellectual and emotional development, *664 and each parent’s financial status and ability to provide for the child) the parents are relatively equal.
The factor which weighs most heavily in this determination is the effect that an award of custody to the mother with permission to relocate might have on the father/son relationship and all of the considerations which enter into this analysis, specifically the child’s chronological age, developmental level and psychological needs, the importance of stability and the impact of the parties’ impending separation on the child. What this child’s reaction to the parents’ breakup will be, how vulnerable the child will feel, how the child’s sense of security will be affected, whether the child will feel conflicting loyalties, whether the child will experience a loss of trust or perceive he has been abandoned or rejected by the absent parent are all unknowns since the parties have not yet separated.
This child is just a little over two years old. Psychologically and developmentally, this is a critical time in the growth of a child. Luis has just entered into the “toddler” stage of development (18-36 months) which brings with it a new set of developmental tasks. While the major developmental task in the first year of life is to acquire a sense of trust and security, the primary developmental task in the second year of life is to achieve independence. Toddlers embark upon the transition from dependency to autonomy as a result of their new found mobility, as a result of developing fine motor skills which allow the child to pick up, hold and manipulate objects, as a result of becoming toilet trained, gaining the ability to sleep through the night and beginning parallel play with other children. The development of psychological autonomy appears as the toddler’s speech and language skills increase. As a toddler’s social sphere expands to include other people beyond the nuclear family (babysitters, playmates, parents of peers and teachers) and environments beyond the home (day-care centers and nursery schools), rudimentary social skills begin to develop.
Mastery of each of these developmental milestones is essential for the toddler in the process of separating emotionally from the parents and acquiring self-esteem and confidence. Judges routinely observe how changes in the family structure, which occur with divorce or separation, can significantly impact upon children’s sense of safety and security, their self-image and feelings of worth, their intellectual functioning and their interpersonal relationships. Diminution of any one of these domains can alter the developmental course for children in a major way. *665 When parents separate or divorce, the distribution of the parenting responsibilities is altered along with the attachment relationship between the child and the nonresidential parent. Very young children do not have a sense of time (meaning the toddler cannot comprehend how long the nonresidential parent is gone and how soon s/he will return) or a sense of “object permanence” in relation to the nonresidential parent (meaning the toddler cannot comprehend that the nonresidential parent still exists even though s/he is not visible). Given this, it is not difficult to conclude that the younger the child the more damaging the separation is to the noncustodial parent’s relationship with the child and as the distance involved in the separation becomes greater, the harm increases exponentially. To nurture the healthy physical, mental and emotional development in a child of this tender age, to assure these essential developmental tasks are accomplished successfully, and to build upon the bonding and attachment that already exists between this father and child, it is this court’s view that the child’s best interests would be served by a resolution of the custodial issues that would maximize the child’s sense of security and trust by providing consistency in the environment, places, care givers and rules. The totality of the circumstances, including the issue of the mother’s relocation, discussed below, supports this determination in the court’s opinion.
B. Relocation
Each case involving a request to relocate must be evaluated on its own merits (Matter of Wisloh-Silverman v Dono, 39 AD3d 555 [2d Dept 2007]). The following evidence in this case is relevant to the Tropea factors. The mother’s reason for wanting to relocate is because she is homesick. This request to relocate does not involve economic necessity or betterment, health-related concerns, the demands of a second marriage, a new romantic interest or the mother’s need to have a “fresh start.” The father’s reason for opposing the move is that he will lose any possibility of maintaining his relationship with the child through regular and frequent contact with his son. Since the child was born, the father has lived with the child and enjoyed being with him every single day. He has been a full participant in caring for and raising this child when he is not at work. Since the mother became employed when the child was two months old, neither parent can claim to be the “primary caretaker” of the child. That role has devolved to the paternal grandmother since she has spent nearly 12 hours a day with the child five days a week practically all of his life.
*666 In terms of the child’s ties to the community and extended family, he is fully integrated with the paternal family including uncles, aunt and cousins with whom he is already acquainted and spends time with regularly. The strongest bond this child has is with the paternal grandmother. He also has a paternal half sister Victoria with whom he has been raised all of his life. In contrast, the child’s only contact with the mother’s family occurred this summer when the mother vacationed in Florida for two weeks and introduced her son to his maternal grandparents, aunts, uncles and cousins there. He does not have an established relationship with them and relocating to Florida would place him in an unfamiliar environment with a new family while dislodging him from a community and family that he has been involved with his whole life. The only established relationship the child has in Florida is his maternal half sister Ashley, with whom he lived until July 2007. In order to prevent disruption to the child’s relationship with his father, he has sought custody of his son and he is a feasible alternative.
Turning to the question of what benefits the child may enjoy or the harm that may ensue if the relocation is or is not permitted the court finds that the mother will be, at least initially, completely dependent upon her family for support and amenities such as a car and childcare. She has no definite plan of whether to live with her mother and stepfather south of Tampa or with her father in Tampa. She speaks of getting her own apartment eventually. She does not have a job lined up and does not even know what type of work she wishes to pursue. She speaks of a desire to attend school but evinced a serious lack of motivation while in New York to get a better job than she has, or to go to school despite the opportunity both here in New York and in Florida when she was younger. With all this uncertainty, it is difficult to imagine how the child’s life would be better in Florida than in New York.
The child’s father is gainfully employed and has been so for years. He has a union job with full benefits and promotional opportunities which he has been given. The court has heard testimony about the father’s efforts to obtain a job in Florida and although his attempts were not aggressive or extensive, opting for a parallel move by the father, under these circumstances, would be undesirable given the discrepancy in pay, benefits, loss of seniority and separation from his close-knit family. It is clear, however, that whether the child stays in New York with the father and/or mother, or goes to Florida with the *667 mother, each parent will have the emotional support and childcare from his or her family.
In those cases where courts have permitted relocation, one of the central issues has been whether the noncustodial parent will be deprived of “regular and meaningful contact” with the child (Tropea at 738), and whether it would be possible to devise “a visitation schedule that will enable the noncustodial parent to maintain a meaningful parent-child relationship” (Tropea at 740).[9] However, under the cases decided following Tropea, the appellate courts have held that a father’s “regular and meaningful contact with the child, while important, is not dispositive and should not be given disproportionate weight in mechanically predetermining the outcome of such a sensitive and complex matter” and a mother’s request to relocate “is not automatically precluded by the prospect that the [father’s] midweek visitation will be jeopardized, since Tropea and its progeny have already established that such a change does not necessarily deny the noncustodial parent meaningful access to the child” (Heisler v Heisler, 30 AD3d 321, 321 [2d Dept 2006]; Cynthia L.C. v James L.S., 30 AD3d 1085 [4th Dept 2006]).[10] There is also case law holding that while “the loss of weekday contact is not insignificant, a visitation schedule could be devised that would allow for the continuation of the meaningful relationship between the father and son” (Matter of Wisloh-Silverman v Dono, 39 AD3d 555, 557 [2d Dept 2007]).[11] Uphold *668 ing the mother’s relocation to Florida, the Second Department extended this view in Matter of Cooke v Alaimo (44 AD3d 655; 655 [2d Dept 2007]) saying that “[w]hile the father’s loss of midweek and alternate weekend visitation is not insignificant, the visitation schedule allows for the continuation of a meaningful relationship between the father and the child” (emphasis added). The age of the child is not ascertainable from the decision but presumably is school-aged and older than the child in the instant matter. In a case involving a lesser distance and a 13-year-old child, the Third Department granted a relocation to Pennsylvania because the mother “was engaged to be married, had been offered a full-time, better paying job,” agreed to continue the father’s alternate weekend visitation and agreed to “creative extended visitation scheduling to further promote the child’s relationship with the [father]” (Matter of Winn v Cutting, 39 AD3d 1000, 1001-1002 [3d Dept 2007]).
What these cases seem to suggest is that relocation will not be denied with older children who have had only a visiting relationship with their noncustodial parent if there are other factors which show the move would be in the child’s best interests (Matter of Fegadel v Anderson, 40 AD3d. 1091, 1093 [2d Dept 2007]).[12] Where the noncustodial parent has been fully involved and the child(ren) are much younger, relocation has not been so readily granted (Zammit v Novellino, 30 AD3d 534 [2d Dept 2006];[13] Matter of Mr. G. v Mrs. M., NYLJ, Aug. 28, 2007 at 27, col. 3).[14]
*669 If there is to be a relocation, what does “meaningful access” mean in the case of a two-year-old child and a father with this degree of involvement and uninterrupted contact? As demonstrated above, because of the child’s age and developmental level and the father’s daily and fully-engaged interaction with the child, no adequate parenting plan can be developed over this long of a distance. At this developmental stage, contact between the father and this toddler by telephone or videocam will not afford him meaningful access nor will it offer him the possibility of maintaining his relationship with the child.
Given the mother’s unemployment and the father’s modest income, the cost to provide for the extensive travel, which would be required to maintain a two-year-old child’s attachment, bonding and developing a relationship with the noncustodial parent would be prohibitive and far beyond the financial resources of these parents (Ritz v Ritz, 36 AD3d 437 [1st Dept 2007]; Schreurs v Johnson, 27 AD3d 654 [2d Dept 2006]).[15] The impact of the move on the quantity and quality of the child’s future relationship with the noncustodial parent is enormous because of the child’s young age and the impossibility of devising a visitation schedule that will enable the father to maintain a developmentally appropriate level of contact coupled with the financial circumstances of the parties (plane fare, motel costs, eating out, work schedules and time/leave benefits and child’s inability to travel unescorted) weigh heavily against this move. In the absence of countervailing factors showing that the quality of the child’s life-style would be substantially enhanced economically, emotionally and educationally by the move (Aziz v Aziz, 8 AD3d 596 [2d Dept 2004]; Miller v Pipia, 297 AD2d at 366), the court finds the mother has failed to establish by a preponderance of the evidence that relocation would be in the child’s best interests and that it would be “feasible to] preserv[e] the relationship between the [father] and the child through suitable visitation arrangements” (Miller at 366).[16] The mother’s willingness to stay in New York if her application for relocation is *670 denied is an important consideration as it evinces her willingness to put the child’s welfare before hers (Matter of Jennifer L.B. v Jared R.B., 32 AD3d 1174 [4th Dept 2006]).
C. Joint Custody
In Braiman v Braiman (44 NY2d 584, 589-590 [1978]), the Court of Appeals held that “joint custody is encouraged primarily as a voluntary alternative for relatively stable, amicable parents behaving in mature civilized fashion.” It is not a viable solution for two parents who cannot put aside deep-seated resentments and communicate or cooperate with one another (Matter of Smith v Miller, 4 AD3d 697 [3d Dept 2004]), or when there is “substantial record evidence of the parties’ distrust of one another [which leads to the] inability to cooperate and act in a mature civilized fashion” (Matter of Morehouse v Morehouse, 251 AD2d 710, 710 [3d Dept 1998] [internal quotation marks omitted]), or when parents become hostile and antagonistic towards each other and are unable to put aside their differences for the benefit of the child (Matter of McCoy v McCoy, 43 AD3d 469 [2d Dept 2007]).
Although the father is willing to consent to the mother having full custody, on this record, there is no evidence to show that an award of joint custody would be contraindicated. The evidence is replete with examples of these parents working together productively and industriously to assure their son is well cared for, happy and nurtured by each of them. Both parties have shown that they are capable of placing the well-being of their son above their own needs (Fiorelli v Fiorelli, 34 AD3d 1216 [4th Dept 2006]); neither one harbors any deep-seated resentments and they both are able to communicate and cooperate with one another; neither one seems inclined to deny or interfere with the other parent’s visitation rights (Matter of Smith v Miller, 4 AD3d 697 [3d Dept 2004]); neither has exercised poor judgment (Matter of Roe v Roe, 33 AD 3d 1152 [3d Dept 2006]); neither is distrustful of the other to the point of being unable to “act in a mature civilized fashion” (Matter of Morehouse v Morehouse, 251 AD2d 710, 710 [3d Dept 1998]); no evidence of hostility or antagonism towards each other has been demonstrated, nor has it been shown that they are unable to *671 put aside their differences for the benefit of the child (Matter of McCoy v McCoy, 43 AD3d 469 [2d Dept 2007]; Matter of Laura A.K. v Timothy M., 204 AD2d 325 [2d Dept 1994]). These parties already have a record of co-parenting this child for the past two years, including a significant period of time following the end of their romance. For this reason the court believes joint custody is viable in this circumstance and would serve the child’s best interests.
Decision
Having made a thorough examination and inquiry into the facts and circumstances of the case and into the surroundings, conditions and capacities of the persons involved in this proceeding, and having weighed the testimony, character, temperament and sincerity of the parties involved, and having given serious consideration to the various factors at issue in this custody/ relocation request, based on a totality of the circumstances and the best interests of the child, the court finds that the father proved by a preponderance of the evidence that relocation should be denied. Inasmuch as the evidence establishes that these parties have the type of working relationship which would make joint decision-making practicable, the court finds there is a sound and substantial basis in the record to grant joint custody of the child to both parties, with physical residence to the mother and regular and frequent contact between the father and the child. In addition to day and overnight visitation, the father may speak to the child by telephone at reasonable times with reasonable frequency.
Based on the child’s chronological age and developmental stage, the parties should establish a visitation schedule for the father that will not create separations of more than two or three days. As the child has been residing in the father’s home, overnight visitation should be included in the schedule the parties create. The parties should develop a plan in which they share or alternate holidays and have the child during their respective vacations. Each parent shall provide the other with a current address and telephone number and will notify each other within 72 hours of any changes to this information. Each parent will immediately notify the other regarding any emergency involving the child.
Except for periods of vacation during the summer, spring or winter school break and day trips during weekend visitation, neither party may remove the child from the jurisdiction of the *672 court without the written permission of the other party. If either party plans to vacation with the child out of New York, an address and telephone number must be provided to the other party where contact may be made in the event of an emergency.
Neither party with custody of the child may relocate beyond a 25-mile radius of where they presently reside without the written consent of the other party.

. The Second Department has held that forensic evaluations are necessary when a parent’s mental and physical health is an issue (Stern v Stern, 225 AD2d 540 [2d Dept 1996]) or when there are “serious issues of fitness” (Matter of Vernon Mc. v Brenda N., 196 AD2d 823, 825 [2d Dept 1993]).

. Family Court Act § 249 governs the appointment of law guardians in proceedings held pursuant to the Family Court Act. Family Court Act § 249 (a) requires the appointment of law guardians for children in child protective proceedings, termination of parental rights and juvenile delinquency proceedings. Pursuant to Family Court Act § 249 (a),
“In any other proceeding in which the court has jurisdiction, the court may appoint a law guardian to represent the child, when, in the opinion of the family court judge, such representation will serve the purposes of this act . . . The family court on its own motion may make such appointment” (emphasis added).
The purpose of the law guardian is to “act as champion of the child’s best interest, as advocate for the child’s preferences, as investigator seeking the truth on controverted issues, or . . . recommend alternatives for the court’s consideration” (Koppenhoefer v Koppenhoefer, 159 AD2d 113, 117 [2d Dept 1990]).

. Family Court Act § 251 (a) authorizes the court to order “any person within its jurisdiction . . . to be examined by a physician, psychiatrist or psychologist appointed or designed for that purpose by the court when such an examination will serve the purposes of this act.”

. In New York, the father is employed at Mutual Redevelopment in Manhattan as a handyman and head locksmith. He started at that job eight years ago as a porter and was upgraded after he went to school for and received training as a locksmith. He has received additional training to be a backup for the First Response Team in his neighborhood and has taken a CPR course through FEMA. He is a union member, earns three weeks’ vacation a year, receives medical benefits and has the child on his medical plan. He works 40 hours a week and earns $20 an hour which is about $41,600 a year.

. This child was born in New York City. His first introduction to any members of the mother’s extended family occurred during the summer of 2007 when the court allowed her to take the child to Florida for a short visit. During this visit the family had a celebration for the child’s second birthday, where many of the photographs introduced into evidence were taken.

. At the end of the mother’s visit to Florida in July, she left her daughter Ashley in the care of her mother so she could start the school year there. She testified that she “felt it was better for her to stay in Florida . . . environmentwise ... to keep her out of arguments me and the father were involved in.”

. When the Court of Appeals issued its decision in Matter of Tropea v Tropea (87 NY2d 727, 738, 732 [1996]) rejecting the three-step analysis that had existed under Weiss v Weiss (52 NY2d 170 [1981]) and opting for a “simultaneous weighing and comparative analysis of all of the relevant facts and circumstances,” the “scope and nature of the inquiry” that courts should make in relocation cases was wholly transformed. The list of factors to be considered is as individual and unique as the cases themselves. Under Tropea (87 NY2d at 738), “no single factor should be treated as dispositive or given such disproportionate weight as to predetermine the outcome.” The Court of Appeals concluded that “[i]n the end, it is for the court to determine, based on all of the proof, whether it has been established by a preponderance of the evidence that a proposed relocation would serve the child’s best interests” (Tropea, 87 NY2d at 741).

. While appreciating “both the need of the child and the right of the noncustodial parent to have regular and meaningful contact,” the central concern focused on by the Court of Appeals is the “impact of the move on the relationship between the child and the noncustodial parent” (Tropea, 87 NY2d at 738-739) and not just its impact on a parent’s visitation since any relocation necessarily involves a disruption to and diminution of the noncustodial parent’s access to the child. Nor is it a balancing of the interests of the respective parents with the interests of the child since relocation is principally motivated by one parent’s interests and then reasons are secondarily constructed to demonstrate how the move would benefit the child. Ancillary to this,
“the courts should be free to consider and give appropriate weight to all of the factors that may be relevant to the determination. These factors include, but are certainly not limited to each parent’s reasons for seeking or opposing the move, the quality of the relationships between the child and the custodial and noncustodial parents, the impact of the move on the quantity and quality of the child’s future contact with the noncustodial parent, the degree to which the custodial parent’s and child’s life may be enhanced economically, emotionally and educationally by the move, and the feasibility of preserving the relationship between the noncustodial parent and child through suitable visitation arrangements” (Tropea, 87 NY2d at 740-741).

. The two cases that were consolidated in Tropea involved postjudgment modifications where a custodial parent had already been selected. The children in Tropea were seven and four years old and the in-state relocation involved a distance of 21h hours by car. The child in Browner v Kenard was four years old and the out-of-state relocation involved a comparable distance of 130 miles. In both cases the mothers had custody and the fathers had an established visitation schedule. Relocation in both cases was permitted in the best interests of the children.

. Heisler (at 321) involved a relocation by the mother “to return to her roots in Baltimore, approximately three hours away, where there is a family environment offering greater emotional and financial support for raising the child.” The mother demonstrated a change in circumstances based on the father’s noncompliance with “crucial aspects of the stipulation” (at 322) “regarding permanent custody and parenting time” (at 321). In Cynthia L.C. (at 1086), the appellate court approved the proposed move to Florida by the joint-custodians (mother and maternal grandmother) because of economic necessity and a showing that the father had “no accustomed close involvement in the child[ ]’s everyday life” (interned quotation marks omitted).

. In Wisloh-Silverman, the mother had sole custody of the 12-year-old child almost all of the child’s life and the father had a visiting relationship with alternate weekends, IV2 hours every Tuesday, holidays and vacations *668 during the summer. She sought relocation to Pennsylvania and committed to driving the child back and forth for alternate weekend visitation.

. In Fegadel (at 1093), the mother’s relocation to Florida was permitted even though “both parties were loving parents” because “the mother has been Katrina’s primary caretaker since the parties’ divorce and has established a primary emotional attachment” to the 16-year-old child and because the child’s,sister, “with whom she has also developed an emotional bond, Uves in Florida and [she] expressly desires to continue that relationship.” Additionally the mother offered health and economic reasons in support of her relocation.

. In Zammit (at 534), the father’s relocation to North Carolina was denied as it “would almost certainly preclude any possibility of the mother and son reestablishing any meaningftil relationship, as the mother is attempting to do at this time.”

. In Mr. G. (id.), the mother’s relocation to Virginia Beach with her 18-month-old child was denied because the “quality, quantity and frequency of visitation will be adversely affected by a move that drastically changes the frequency with which the child and noncustodial parent can see each other.” In this case the father assumed his parental role five days a week going to the home when the mother was at work.

. In Ritz (at 437), the First Department found it “highly doubtiul that the parties’ resources are such as to facilitate frequent air travel between New York and Israel.” In sharp contrast, the Second Department found in Schreurs (at 655) it was feasible to maintain the parent/child relationship because the father was able to pay for the “mother’s expenses to visit the child in Florida every other weekend.”

. In Miller, the Court found the mother was the primary caretaker of the four-year-old child since birth and established the primary bond with the child. She offered the child a more suitable home environment, and had been *670 unable to find work in New York with sufficient compensation to rent an apartment and pay for child care. In Florida the mother had a “strong support network which allows her to work full time while the child is either with family members or in day care” (id.). Additionally she was able to save money by living -with her mother.