James P. VALKOUN

v.

Kimberly M. FRIZZLE.

Nos. 2007–202–Appeal, 2008–207–Appeal.

Supreme Court of Rhode Island.

July 1, 2009.

David E. Revens, Esq., Warwick, for Plaintiff.

Russell Bramley, Esq., Warwick, for Defendant.

Present: GOLDBERG, Acting C.J., SUTTELL, ROBINSON, JJ., and WILLIAMS, C.J. (ret.).

## OPINION

*Justice ROBINSON for the Court.*

The plaintiff, James P. Valkoun, has appealed from a Family Court order granting the motion of the defendant, Kimberly M. Frizzle, whereby she sought leave to relocate from Rhode Island to North Carolina with the parties' two minor children. The defendant for her part has appealed from the Family Court's denial of her motion to dismiss the plaintiff's appeal.

This case came before the Supreme Court on March 31, 2009, pursuant to an order directing the parties to appear and show cause why the issues raised in these appeals should not be summarily decided. After considering the written and oral submissions of the parties, we are of the opin-

ion that the appeals may be resolved without further briefing or argument.

For the reasons set forth below, both appeals are denied and dismissed, and the order of the Family Court is affirmed.

## I

### Facts and Travel

The parties in the case at bar were never married, but they did live together intermittently for several years and had two children, Sarah Rose Frizzle and Ethan Andrew Frizzle.[1] In 2006 Ms. Frizzle commenced a paternity action against Mr. Valkoun; that case was resolved when an agreement between the parties was reached, whereby Mr. Valkoun acknowledged that he was the father of Sarah and Ethan and agreed to pay $150 per week in child support. The issue of custody was not addressed in that proceeding.

In August of 2006, Mr. Valkoun filed a motion seeking to prevent Ms. Frizzle from removing Sarah and Ethan from Rhode Island and taking them to North Carolina; he later filed a motion seeking custody of the children. Ms. Frizzle responded by filing several motions: she filed a motion to relocate; a motion to modify child support payments; a motion for sole custody of the parties' children; and a motion to dismiss Mr. Valkoun's motion seeking to prevent Ms. Frizzle's relocation of their children. While the above-mentioned motions were pending, the Family Court ordered (1) that Ms. Frizzle be allowed to remain in the home that the parties had shared while living together and (2) that Mr. Valkoun would be required to give twenty-four hours notice to Ms. Frizzle before going to that home.[2]

1. In addition to the children who are the subject of the instant appeal, each of the par-

ties has an additional child from previous relationships.

2. We shall hereinafter usually refer to the

On January 12, 2007, the Family Court entered an order establishing a visitation schedule and ordering the parties to attend mediation. A subsequent order was entered on April 11, 2007, barring Mr. Valkoun from entering upon the property where the couple's home was located and where Ms. Frizzle was living, except when he was exercising his visitation rights.

The hearing on defendant's motion to relocate began on April 24, 2007 and continued off-and-on through May 4, 2007. The trial justice issued a bench decision on May 23, 2007, in which he awarded physical placement of the children to Ms. Frizzle and granted her motion to relocate to North Carolina. An order to that effect was entered on June 14, 2007, and Mr. Valkoun filed a notice of appeal on the same day.[3] Shortly thereafter, Ms. Frizzle moved to vacate the June 14 order, arguing that it did not accurately reflect the trial justice's decision. The motion was granted, and a new order was entered on July 31, 2007. In the interim, on July 3, 2007, Ms. Frizzle had filed a notice of appeal from the June 14 order.

### A

### Motion for Custody and Motion to Relocate

Ms. Frizzle testified in support of her motion to relocate. She testified as to the details of her relationship with Mr. Valkoun, noting that she had begun living with him during the Summer of 1999 in an apartment in Coventry, Rhode Island. She further testified that two years later, they moved to Mr. Valkoun's home in Warwick.

She further testified that the couple separated in 2001 for the first time due to Mr. Valkoun's infidelity. She went on to testify with respect to the various details surrounding their several separations, including the fact that they separated again in 2002 and 2003 because of plaintiff's involvement with other women. Ms. Frizzle also testified that plaintiff's name was not on Sarah's birth certificate at the time of her birth because Mr. Valkoun refused to sign an affidavit acknowledging paternity.[4]

She further testified that, in 2003, Mr. Valkoun and she attended counseling and again reunited until their final separation in May of 2006. Ms. Frizzle testified that at that time Mr. Valkoun left their home without saying goodbye to the children.

Ms. Frizzle also testified regarding her involvement with the children and their daily activities. She testified that she brings them to medical appointments, cooks for them, and tends to their day-to-day routine. She testified that she is actively involved in Sarah's day-care center and school, attends her sporting events, helps her with her homework, and reads with her.

Ms. Frizzle also testified about Mr. Valkoun's weekend visitation with the children. She testified that she allows Sarah to talk to him every night, that she sends pictures of the children to his cell phone, and that she allows him to pick them up early for weekend visits if he chooses.

Ms. Frizzle also testified regarding several conflicts that she and plaintiff have

house in Warwick where Mr. Valkoun and Ms. Frizzle had once lived together as "the couple's home."

3. The plaintiff also filed a motion with this Court seeking a stay of the Family Court's order. That motion was denied.

4. It will be recalled that in 2006 Ms. Frizzle filed a paternity action; thereafter, by written agreement between the parties, Mr. Valkoun acknowledged paternity as to both Sarah and Ethan.

had about the children or about the couple's home. In August of 2006, an order was entered requiring Mr. Valkoun to give twenty-four hours notice before coming to the couple's home. She testified that, when they first separated in 2006, Mr. Valkoun would come to the house only once in a while but, by February or March, he was coming over three or four times a week and staying for several hours. She stated that she often left the home when he arrived so as to avoid arguing with him in front of the children. Ms. Frizzle described a specific incident which occurred just before Easter in 2007, when plaintiff told her that he planned on sleeping at the house and that no one could prevent him from doing so. The defendant also testified that Mr. Valkoun used profane language in front of the children, screamed at her, and called her names. On April 11, 2007, an order was entered preventing plaintiff from entering the couple's home except for the purpose of picking up the children for visitation.

Ms. Frizzle also testified regarding her employment history. She stated that, to support herself and her son, she had worked as an exotic dancer for two and one-half years.[5] She testified that she has a high school equivalency diploma and would like to take college courses. She testified that, in the past, she had worked as a certified nursing assistant but that her hours were uncertain and that she eventually lost her certification.

Ms. Frizzle stated that she would like to relocate with her children to North Carolina in order to live with her parents. She testified that her parents have offered to allow her to live with them rent-free so that she could attend college, and she added that her mother has offered to provide free child care. She stated that she has looked into a program that would allow her to become a nurse's aide and has also considered entering a paralegal program. She testified that in the past she had spoken with Mr. Valkoun about her desire to continue her education, but she said that he dismissed these ideas and told her that her lack of education was her own problem. Ms. Frizzle also introduced evidence to show that the type of home she could afford to provide for her children in Rhode Island would be inferior to her parent's home in North Carolina.

Ms. Frizzle testified as to certain incidents which reflected unfavorably upon Mr. Valkoun. She stated that he shut off her cable television and phone between August and November of 2006 and that he shut off the air conditioner in August of that year through the breaker box in the basement. She also testified that, in October of 2006, he installed a lock box on the thermostat so that she could not control it. Ms. Frizzle further testified that in November of 2005 he took away the minivan she had been driving and eventually sold it. Ms. Frizzle also described an incident that occurred during the Christmas season in 2004 while she was pregnant with Ethan. She stated that she fell on the stairs at home; and, as she grabbed the handrail, she put a quarter-sized dent in the wall. She testified that Mr. Valkoun "was screaming and swearing" at her because of the damage to the wall. Ms. Frizzle also testified that plaintiff would not provide food, clothing, or diapers for the children and that she eventually applied for government assistance.

Ms. Frizzle's mother, Cathy Frizzle, also testified at trial. Cathy Frizzle testified

---

5. Ms. Frizzle also stated that she returned to dancing for two or three days in 2003 after she and Mr. Valkoun had separated.

that she lives in a quiet rural neighborhood in Wilton, North Carolina with her husband Fred Frizzle, defendant's father. She stated that she volunteers at the Wilton Elementary School two or three times a week. She also testified about Wilton Elementary School, stating that there is end-of-grade testing in the third and fifth grade and that students must pass these tests in order to be promoted to the next grade. She also stated that there are many activities for children in her area— such as sports, arcades, miniature golf, and movie theatres. Cathy Frizzle testified that she often returns to Rhode Island to visit family and that she would be willing to bring the children with her in an effort to facilitate visitation by Mr. Valkoun. She further testified that she has a close relationship with her grandchildren; and, because she does not work, she would be able to care for her grandchildren while her daughter attends school. She also stated that she and her husband would allow Kimberly and the children to live with them rent-free as long as necessary.

Ms. Frizzle's sister (Dawn Cabral) and her aunt (Pamela Calderone) also testified on her behalf. Ms. Cabral testified regarding events that she had observed involving plaintiff's behavior. She testified that she would sometimes visit the couple's home in Warwick during the day and Mr. Valkoun would return home for lunch; she stated that on those occasions she did not observe much interaction between Mr. Valkoun and his children. She also described an incident that occurred during Sarah's birthday party on December 2, 2006. She testified that Mr. Valkoun came to the couple's home and began taking pictures of the vehicles parked near the home. Ms. Cabral stated that she was offended by this because Mr. Valkoun was a police officer and she believed that he was conducting a check on her vehicle's license plates. She testified that Sarah was very upset while this was happening and was screaming for her father to go away.

Ms. Caldarone testified that she babysat for Sarah for about three months during 2001 at the couple's home. She stated that, when Mr. Valkoun would come home for lunch, he usually did not acknowledge Sarah or her. Ms. Caldarone testified regarding an incident which occurred in October of 2005. She stated that she had picked up Ms. Frizzle's son Joseph from the library and, when she arrived at the couple's home, she asked Mr. Valkoun why he had removed the license plates from Ms. Frizzle's van. She testified that Mr. Valkoun responded that it was his van and that he could remove the plates if he pleased. She further testified that plaintiff swore at her, called her names, and told her to get off his property.

Mr. Valkoun presented evidence in opposition to defendant's motion to relocate and in support of his motion for custody and his motion to be allowed to move back into his home in Warwick. Mr. Valkoun testified that he has been employed by the Warwick Police Department since December of 1996 and that, at the time of trial, he held the rank of sergeant. He stated that he works the third shift with a rotating schedule of four days on, two days off. He testified that, if given custody of his children, his mother would take care of them while he worked.

Mr. Valkoun testified that he purchased the couple's home in April of 1993, while he was married to his first wife. He testified that, after their divorce, he remarried and lived there with his second wife, with whom he has one child. He testified that the relationship among his three children is "very close" and that he takes them swimming, and also takes them for bike rides, to the library, and to special events such as the circus.

Mr. Valkoun also testified with respect to the home environment with Ms. Frizzle. He testified that both he and defendant shared responsibility for the care of the children and that they both bought food for the house. He testified that he occasionally accompanied Ms. Frizzle on visits to the pediatrician and took the children to the dentist. He further testified that, since moving out of the couple's home, he has engaged in many activities with his children and attended a teacher conference at Sarah's school. Mr. Valkoun stated that, if given custody of the children, he would be very flexible with respect to a visitation schedule.

Mr. Valkoun presented a different version of some of the events to which defendant's witnesses testified. He testified that he removed the license plates from the minivan Ms. Frizzle drove because it was not running properly, and he wanted a mechanic to look at the van before defendant continued to drive it. He stated that defendant wanted to drive the vehicle anyway and he took the license plate off the vehicle to prevent her from doing so. He also presented invoices from a repair facility detailing repairs to the van in March of 2006.

The plaintiff also testified regarding the incident in which Ms. Frizzle fell down the stairs. He stated that she had gone upstairs several times during the evening because Sarah was refusing to go to bed, that she was "acting like a raging lunatic," and that he tried to calm her down after she fell. He did admit that he was upset by the hole Ms. Frizzle made in the wall.

Mr. Valkoun also testified regarding the incident which took place during Sarah's birthday party in December of 2006. He stated that he went to the home because it was his regular visitation day, but that, upon arriving, he was informed by defendant that he would not be allowed to see Sarah that day because she was having a birthday party for her. He stated that he took pictures of the cars at the party because he wanted to document that he was there for his visitation. He explained that Ms. Frizzle had been denying him visitation and that he had taken her to court on contempt charges. On cross-examination, Mr. Valkoun admitted that Ms. Frizzle had spoken to him before the day of the party and informed him that she was planning Sarah's party for the day in question.

Mr. Valkoun also presented evidence tending to discredit Ms. Frizzle. He testified that Ms. Frizzle followed him one day as he was driving on Interstate 95 and that she had Sarah in the car seat in the backseat of the car. He stated that, after exiting the highway, he was stopped in traffic and Ms. Frizzle got out of her car and jumped into the back portion of his pickup truck. He stated that she opened the window on the back of the truck, threw a picture of herself and a note into the cab. Mr. Valkoun testified that he was with a female friend at the time but that he was not romantically involved with that person.

In addition, plaintiff called Ms. Frizzle as an adverse witness. Counsel introduced into evidence a letter that Ms. Frizzle wrote to her son Joseph when he was fifteen-years-old. In the letter, which was never actually delivered to the boy, Ms. Frizzle decried her teenage son's behavior and accused him of swearing at her, carrying weapons, fighting, failing in school, and doing drugs. Ms. Frizzle testified that she had just caught Joseph skipping school and that she wrote the letter because she was angry. She further testified that, after she wrote the letter, she placed it under some papers in a cabinet and did not give it to Joseph.

The trial justice delivered a bench decision on May 23, 2007. He summarized the testimony and exhibits presented by both

parties and applied the factors set forth in *Pettinato v. Pettinato,* 582 A.2d 909 (R.I. 1990), in order to determine which party should have custody of the children. At several points in his decision, he found that plaintiff acted unwisely, unreasonably, or immaturely. He also found parts of plaintiff's testimony to be lacking in credibility. After considering the *Pettinato* factors, the trial justice awarded plaintiff and defendant joint custody of Sarah and Ethan and concluded that it would be in the best interests of the children to be placed with the mother.

The trial justice next turned to defendant's motion to relocate to North Carolina with the children, indicated that he would be guided by the factors set forth in *Dupre v. Dupre,* 857 A.2d 242 (R.I.2004). After considering those factors, the trial justice granted defendant's motion for relocation. The judge granted reasonable visitation rights to plaintiff and awarded him possession of the couple's home in Warwick.

The plaintiff raises several issues in his appeal from the order awarding custody of the children to defendant and granting her request to relocate to North Carolina with the children. He first contends that the trial justice erred in failing to evaluate defendant's relocation motion in light of the *Pettinato* factors, as required by *Dupre.* The plaintiff also contends that the trial justice erred in finding that defendant's reasons for relocating were valid, asserting that Ms. Frizzle failed to present competent evidence that she was pursuing a real career in North Carolina and that there was no evidence that the children's quality of life would be improved by the move to North Carolina. The last issue raised by plaintiff is that the trial justice overlooked evidence with respect to Ms. Frizzle's relationship with her son, Joseph, in determining her fitness as a parent and her ability to provide a stable home for the children.

**B**

**Motion to Dismiss Appeal and Motion to Extend Time to Transmit Record**

The plaintiff's June 14, 2007 notice of appeal indicates that a transcript would be ordered; however, the record indicates that plaintiff did not actually order the transcript until August 6, 2007—*i.e.,* approximately one month after the expiration of the twenty-day period mandated by Article I, Rule 10(b)(1) of the Supreme Court Rules of Appellate Procedure. On the same day, plaintiff also filed a motion for an extension of time within which to transmit the record. The defendant filed an objection to this motion. It is undisputed that the just-mentioned motion was filed within sixty days of the filing of the notice of appeal, as is required by Article I, Rule 11(c) of the Supreme Court Rules of Appellate Procedure.

At the August 14, 2007 hearing on defendant's motion for an extension of time within which to transmit the record, counsel for plaintiff explained that Mr. Valkoun had been contemplating whether or not to pursue his appeal during that time. He also stated that Mr. Valkoun had already paid for the transcript. The defendant filed an objection to plaintiff's motion for an extension of time prior to the hearing, but she did not file the motion to dismiss plaintiff's appeal until August 16, 2007— *i.e.,* two days after the hearing had taken place. However, both parties filed memoranda regarding both the motion to dismiss and the motion for an extension and submitted those memoranda to the trial justice before he issued his decision on these motions.

After the hearing, defendant filed a motion to dismiss plaintiff's appeal for failing to order the transcript within the time required by Rule 10(b)(1) and for failure to cause timely transmission of the required as required by Rule 11(a). The hearing justice granted plaintiff's motion for an extension of time and denied defendant's motion to dismiss the appeal. The defendant's instant appeal is from this procedural decision.

In his decision, the trial justice noted that plaintiff's motion for an extension of time was timely; he further noted that, although plaintiff had not ordered the transcript within the time provided by Rule 10(b), he had ordered it before the expiration of the sixty-day period within which to transmit the record or to file a motion for an extension. The trial justice also noted that defendant had already relocated to North Carolina. He concluded that it would be unfair to dismiss plaintiff's appeal and that it was in the interests of justice and fairness to grant plaintiff's motion for an extension. Accordingly, the trial justice denied defendant's motion to dismiss.

On appeal, defendant contends that plaintiff's appeal should have been dismissed because he failed to order the transcript within the time period required by Rule 10(b) and because he failed to transmit the record within the time required by Rule 11(a).

## II

## Analysis

### A

### Motion to Dismiss Appeal and Motion to Extend Time to Transmit Record

 When this Court reviews a trial justice's decision to extend time for transmission of the record under Rule 11, "our review of such a ruling will be limited to the question of whether, in so doing, the trial justice abused his [or her] discretion." *Armstrong v. Armstrong*, 115 R.I. 144, 146, 341 A.2d 37, 39 (1975); *see also Daniel v. Cross*, 749 A.2d 6, 9 (R.I.2000). In determining whether or not there has been an abuse of discretion, "we adhere to the standards used in granting extensions of time for transmission of the record." *Armstrong*, 115 R.I. at 146, 341 A.2d at 39; *see also Daniel*, 749 A.2d at 9. Accordingly, the moving party must "show that the inability of the appellant to cause timely transmission of the record is due to causes beyond his or her control or to circumstances which may be deemed excusable neglect." Rule 11(c); *see also Daniel*, 749 A.2d at 9; *Armstrong*, 115 R.I. at 146, 341 A.2d at 39.

It will be recalled that defendant contends that plaintiff's appeal should have been dismissed because he failed to order the transcript within the time period required by Rule 10(b)(1) and failed to transmit the record within the time required by Rule 11(a). Ms. Frizzle further contends that plaintiff failed to show excusable neglect and that the trial justice erred in granting plaintiff's motion for an extension of time and in denying defendant's motion to dismiss.

Rule 10(b)(1) provides that "[w]ithin twenty (20) days after filing the notice of appeal the appellant shall order from the reporter a transcript of such parts of the proceedings * * * as the appellant deems necessary for inclusion in the record." The rule does not contain a provision for an extension of time.

Rule 11(a) states that the record on appeal shall be transmitted to this Court within sixty days after a filing of a notice of appeal, unless that time period is shortened or extended by an order. *See also*

*Estate of Mitchell v. Gorman,* 970 A.2d 1, 5 (R.I.2009). Rule 11(a) also provides that the appellant shall comply with Rule 10(b) "[p]romptly after filing the notice of appeal * * *."

In denying defendant's motion to dismiss, the trial justice noted that plaintiff's motion for an extension of time was timely and that, although plaintiff had not ordered the transcript within the time provided for in Rule 10(b)(1), it was ordered before the expiration of the sixty-day period within which to transmit the record or file a motion for an extension. He concluded that it would be unfair to dismiss plaintiff's appeal and deny plaintiff's motion for an extension of time. We do not perceive any abuse of discretion on the part of the trial justice in so ruling.

**B**

**Child Custody and Relocation**

■ On review, this Court will not disturb the findings of fact made by the Family Court with respect to the issue of custody and the best interests of the child unless the trial justice "abused his [or her] discretion in making a particular custody award." *Berard v. Berard,* 749 A.2d 577, 579 (R.I.2000); *see also McDonough v. McDonough,* 962 A.2d 47, 52 (R.I.2009). This Court will affirm an award "unless the trial justice's factual findings overlooked or misconceived material evidence or were clearly wrong." *McDonough,* 962 A.2d at 52; *see also Berard,* 749 A.2d at 580.

■ The plaintiff first argues that the trial justice erred in that he failed to evaluate defendant's motion to relocate in light of the factors set forth in *Pettinato v. Pettinato,* 582 A.2d 909 (R.I.1990), as is required by this Court's decision in *Dupre v. Dupre,* 857 A.2d 242 (R.I.2004).

■ In *Pettinato,* this Court set forth several factors that are to be considered by a trial justice in evaluating the best interests of a child whose custody is in dispute. Those factors are:

"1. The wishes of the child's parent or parents regarding the child's custody.

"2. The reasonable preference of the child, if the court deems the child to be of sufficient intelligence, understanding, and experience to express a preference.

"3. The interaction and interrelationship of the child with the child's parent or parents, the child's siblings, and any other person who may significantly affect the child's best interest.

"4. The child's adjustment to the child's home, school, and community.

"5. The mental and physical health of all individuals involved.

"6. The stability of the child's home environment.

"7. The moral fitness of the child's parents.

"8. The willingness and ability of each parent to facilitate a close and continuous parent-child relationship between the child and the other parent." *Pettinato,* 582 A.2d at 913–14.

The Court in that case further held that the best interests of the child should not be determined with reference to any one factor, but rather the trial justice "must consider a combination of and an interaction among all the relevant factors that affect the child's best interests." *Id.* at 914.

In the instant case, the trial justice discussed each of the *Pettinato* factors in his decision. He found that both parties were seeking sole custody of the children and that the children were too young to express a preference. The trial justice then considered the evidence presented by the parties concerning the relationship each

has with the children and the children's relationships with other relatives. He noted that Ms. Frizzle had been more involved in the children's day-to-day life, although he also noted that plaintiff enjoys spending time with his children. The trial justice also made note of the testimony of Ms. Frizzle's aunt (Pamela Calderone), who testified at trial that she had observed that Mr. Valkoun sometimes gave little attention to Sarah when he would come home for lunch while she was baby-sitting the child. The trial justice next considered the children's adjustment to home, school, and community, and he found that Sarah was doing well in the local public school kindergarten. He noted that Ethan was too young to have a showing of adjustment outside the home. The trial justice also noted, with respect to the children's mental and physical health, that Ethan did have some medical issues but that neither Sarah nor the parents had other problems.

The trial justice paid considerable attention to the stability of the children's home environment. He noted that Ms. Frizzle has had custody of the children throughout the parties' separation and that they have been with her for virtually their entire lives. The trial justice took into consideration a contempt order that had been entered against Ms. Frizzle with respect to her having failed to permit Mr. Valkoun to exercise his visitation rights; he also took note of the fact that plaintiff did not seek visits with his children when the couple first separated. He also discussed the incident that occurred at Sarah's birthday party, stating that Mr. Valkoun acted "unwisely * * * immaturely and not in the best interests of his daughter on that day."

In addressing the moral fitness of the parties, the trial justice declined to find either party's past actions to be either moral or immoral. He concluded that plaintiff and defendant were both morally

fit parents. The trial justice also noted that there was no evidence with respect to either party's religious beliefs.

The trial justice also considered the willingness of the parties to facilitate a relationship with the non-custodial parent. He reviewed several incidents that were testified to by the various witnesses, including Ms. Frizzle's aunt and sister. He found the testimony of defendant's witnesses to be credible, and he concluded that Mr. Valkoun's behavior "does not show a person who would want to cooperate and facilitate visits with a non-custodial parent." He also found that the behavior that Mr. Valkoun exhibited during several of the incidents that were testified to demonstrated that he had acted immaturely. After evaluating all these factors, the trial justice concluded that physical placement of the children should be awarded to Ms. Frizzle.

■■■ The trial justice then turned to the question of relocation and discussed this Court's opinion in *Dupre*. This Court in *Dupre* ruled that a "parent's ability to relocate for legitimate reasons should not be burdened by having to demonstrate that such reasons are also 'compelling,' provided that the relocation is in the child's best interests." *Dupre*, 857 A.2d at 254. The Court also identified the following nonexclusive factors as being of particular significance with respect to the issue of relocation:

"(1) The nature, quality, extent of involvement, and duration of the child's relationship with the parent proposing to relocate and with the non-relocating parent.
" * * * *

"(2) The reasonable likelihood that the relocation will enhance the general quality of life for both the child and the parent seeking relocation, including, but

not limited to, economic and emotional benefits, and educational opportunities.

" * * *

"(3) The probable impact that the relocation will have on the child's physical, educational, and emotional development.

" * * *

"(4) The feasibility of preserving the relationship between the non-relocating parent and child through suitable visitation arrangements, considering the logistics and financial circumstances of the parties.

" * * *

"(5) The existence of extended family or other support systems available to the child in both locations.

" * * *

"(6) Each parent's reasons for seeking or opposing the relocation.

" * * *

"(7) In cases of international relocation, the question of whether the country to which the child is to be relocated is a signatory to the Hague Convention on the Civil Aspects of International Child Abduction * * *.

"(8) To the extent that they may be relevant to a relocation inquiry, the *Pettinato* factors also will be significant." *Dupre*, 857 A.2d at 257–59.

No single factor is dispositive and "[e]ach case will present its own unique circumstances that a trial justice must balance and weigh as he or she deems appropriate." *Id.* at 259. Further, in both the instant case and in *Dupre*, the trial justice was charged with making an initial determination concerning custody; in such cases, the Court has emphasized that "the focus is squarely on the best interests of the child, and the parents come before the court on an equal footing * * *." *Id.* at 260; *see also McDonough*, 962 A.2d at 53 n.10 ("Both parents share an equal burden

of demonstrating with which parent the child's interests will be best served.").

In discussing the first *Dupre* factor, the trial justice noted that Ms. Frizzle has been the children's primary caregiver.

In addressing the second *Dupre* factor, the trial justice noted the evidence that was presented by Ms. Frizzle, which evidence tended to show (1) that her quality of life would be improved by moving to North Carolina; (2) that she would be able to further her education in that state; and (3) that she would have access to free daycare. The trial justice found that Ms. Frizzle's mother, Cathy Frizzle, was a credible witness when she testified with respect to the nature of her neighborhood in North Carolina, the quality of the local elementary school that the children would attend, and the activities available to the children in her area. In addition, the trial justice noted that Cathy Frizzle, in view of her regular trips to Rhode Island from North Carolina, would be available to help facilitate visitation between the children and Mr. Valkoun.

In discussing the third *Dupre* factor, (*viz.*, the probable impact that relocation would have on the physical, educational, and emotional development of the children), the trial justice found that the school system in North Carolina was "at least as good" as the current public school attended by Sarah in Rhode Island. The trial justice further found that, although Ethan did have some medical issues, these medical issues were not so extreme or so difficult to treat that they would make it unlikely that a pediatrician could be found to attend to these needs in North Carolina. In turning to the emotional development of the children, the trial justice recognized that the children would suffer some loss due to the fact that they would no longer have weekly visits with their father if relocation was allowed. However, he also not-

ed that in North Carolina they would have a home to live in and daily contact with their grandmother; he also mentioned the advantages for the children that would result from their mother's opportunity to further her education and improve her employment status.

Next, the trial justice discussed the fourth *Dupre* factor—*viz.*, the feasibility of preserving the relationship between the non-relocating parent and the children through suitable visitation. The trial justice reiterated that the maternal grandmother, Cathy Frizzle, is available to assist in facilitating visitation with Mr. Valkoun. He further noted that, as established by the trial testimony and exhibits, Mr. Valkoun would have sufficient money available to allow him to travel to North Carolina to visit with the children there or to pay for the children to visit him in Rhode Island. The trial justice recognized that Ms. Frizzle had a very limited amount of money at the time, but he again found Cathy Frizzle's testimony with respect to her willingness to facilitate visitation to be "credible and compelling."

The trial justice next turned to the fifth *Dupre* factor and addressed the availability of extended family in both North Carolina and Rhode Island. He found that both locations provided the opportunity for contact with extended family. He again noted that Cathy Frizzle's offer to facilitate visitation would enable the children to have contact with their extended family in Rhode Island in addition to their contacts with other extended family members in North Carolina.

Turning to the sixth *Dupre* factor, the trial justice then considered each parent's reason for seeking or opposing relocation. He found that Ms. Frizzle's reasons for moving appeared to be sincere. He further found that North Carolina "offers more for Defendant than she can currently

achieve in Rhode Island based upon her current circumstances." The trial justice compared the type of home that Ms. Frizzle would be able to provide for her children in Rhode Island with that which was available to her in North Carolina (*viz.*, her parents home). He found that Ms. Frizzle "simply cannot provide as well for herself and her children in Rhode Island at this time."

The final *Dupre* relocation factor calls for taking into account the *Pettinato* factors "[t]o the extent that they may be relevant * * *." *Dupre*, 857 A.2d at 259. In discussing this factor, the trial justice stated that he had already applied those factors to the question of custody and that he found that placement of the children with Ms. Frizzle was in the best interests of the children. After awarding Mr. Valkoun possession of the couple's home, the judge reasoned that the children would be required to move from the only home they have ever known to either an apartment in Rhode Island or to North Carolina.

The plaintiff contends that the trial justice erred when he failed to re-consider the *Pettinato* factors with respect to the issue of relocation and discussed the factors only as they applied to the determination of custody. We do not agree.

The trial justice thoroughly reviewed the testimony and exhibits presented by each party and discussed the applicable law. As detailed above, the trial justice analyzed each of the *Pettinato* factors in light of the evidence presented in the just-decided motions for custody. He then turned to defendant's motion to relocate and discussed the *Dupre* factors, carefully examining the evidence with respect to each of those factors. The trial justice recognized that the *Pettinato* factors represent specific concerns to be considered in deciding the best interests of the child in a particular relocation case. He stated that he was

required to "determine if relocation is in the best interests of Ethan and Sarah."

The trial justice had already engaged in an exhaustive evaluation of the evidence with respect to each of the *Pettinato* factors when he decided the parties' motions for custody. The trial justice had already found that the children were too young to express a preference for custody; it is unlikely that a dissimilar result would have been reached with respect to their preference regarding a move to North Carolina. Likewise, the parents' preferences were unlikely to change with respect to the relocation issue. The trial justice had already evaluated the mental and physical health of the parties, the moral fitness of the parents, and the willingness of each party to facilitate a relationship with the noncustodial parent. To reiterate each *Pettinato* factor again in discussing the motion to relocate would have been needlessly repetitious. It is clear from the record that the trial justice took into consideration the pertinent *Pettinato* factors

■ The plaintiff next argues that the trial justice erred in finding that defendant's reasons for relocating were valid. He contends that defendant failed to present competent evidence that she was pursuing a real career in North Carolina; he argues that she wishes to move only in order to take advantage of her parents' offer of free child-care. Mr. Valkoun also contends that there was no evidence that the children's quality of life would be improved by the move to North Carolina.

■ In *Dupre*, 857 A.2d at 258, the Court stated as follows:

"A parent's desire to relocate with his or her children ought not be predicated upon a whim. On the other hand, as we previously have noted, a relocating parent need not establish a compelling reason for the move. The motivation for the relocation, however, will be a significant consideration. Clearly, a vindictive desire to interfere in the other parent's relationship with the child would weigh heavily against the parent seeking to relocate."

This Court in *Dupre* also identified several reasons for relocation that would be considered valid, such as the desire to be close to family or other sources of support, the pursuit of employment or educational opportunity, and the prospect of improving the family's quality of life. *Id.* at 258–59. When considering what factors may be relevant in deciding a motion for relocation, that determination is confided to the discretion of the trial justice and that discretion should not be unduly restricted. *Id.* at 257; *see also McDonough*, 962 A.2d at 54. We perceive no error in the trial justice's decision to grant defendant's motion to relocate.

■ We now turn to the last issue raised by plaintiff—namely, that the trial justice overlooked evidence with respect to Ms. Frizzle's relationship with her son Joseph in determining her fitness as a parent and her ability to provide a stable home for the children. In his decision, the trial justice discussed the evidence presented by plaintiff indicating that Ms. Frizzle and Joseph's father had exchanged custody of Joseph several times. The trial justice referred to the several exhibits that had been received during the trial showing Ms. Frizzle's involvement with her children, including her involvement with Joseph. He further noted that Sarah and Ethan had lived with Ms. Frizzle all of their lives and that, at one point during the couple's separation, Mr. Valkoun did not seek visitation with his children and refused overnight visits with Ethan. The trial justice also discussed the incident involving Sarah's birthday party, finding that Mr. Valkoun's testimony regarding his understanding of

the visitation order related to that day was "evasive and simply not credible." The trial justice cited this incident as an example of Mr. Valkoun's immature and unreasonable behavior. The trial justice also discussed the testimony presented by Ms. Frizzle, her mother, and her aunt concerning defendant's abilities as a mother and her involvement with the children's lives. We perceive no error in the trial justice's determination that Ms. Frizzle was a fit parent who would provide a stable home for the children.

## Conclusion

For the reasons set forth in this opinion, both appeals are denied and dismissed. The order of the Family Court is affirmed, and the papers in this case may be remanded to that court.

Justice FLAHERTY did not participate.