DALE V. SANDSTROM, J., concurs in the result.

2011 ND 31

**Dale E. PEMBER, Plaintiff, Appellant and Cross–Appellee**

v.

**Lauren R. SHAPIRO, Defendant, Appellee and Cross–Appellant.**

**No. 20100149.**

Supreme Court of North Dakota.

Feb. 8, 2011.

Robert J. Schultz, Fargo, N.D., for plaintiff, appellant and cross-appellee.

Timothy J. McLarnan, Moorhead, MN, for defendant, appellee and cross-appellant.

SANDSTROM, Justice.

[¶ 1] Dale Pember appeals the district court judgment awarding custody of the

parties' minor children to Lauren Shapiro and establishing his child support obligation.[1] Shapiro cross-appeals, claiming the district court erred as a matter of law in the division of assets and debts of the parties. We affirm the district court's custody award and order granting Shapiro's relocation request, deny Shapiro's cross-appeal, and reverse and remand to the district court to recalculate Pember's child support obligation.

I

[¶ 2] Pember sued for divorce from Shapiro in September 2008. The parties went before the district court to decide the issues of physical and legal custody of their children, spousal support, child support, and division of assets. Testimony was heard from both parties, as well as other witnesses, and other pieces of evidence were received by the court.

[¶ 3] Pember and Shapiro testified they began dating in 1997 while both were living in Kansas. Shapiro was employed as a college professor, and Pember worked at various computer programming jobs. Approximately one year after they began dating, Shapiro became pregnant and the parties married shortly thereafter.

[¶ 4] Shapiro and Pember met with a lawyer to sign a premarital agreement on the morning of their wedding. According to Shapiro, she sought a lawyer to prepare the agreement at the urging of her mother. Pember testified the execution of the agreement took place entirely at the lawyer's office, and the agreement was not revised or altered in any way. Pember stated he was not familiar with the agreement, but was under the impression that the parties were keeping sole ownership of their premarital possessions. He was not advised to seek independent legal advice and did not do so.

[¶ 5] While they were married, the parties had two more children and moved from Emporia to Topeka, Kansas. In 2007, the parties moved with their three children to Fargo, primarily, according to the testimony of both parties, so Pember could take a job at a local college. Neither party had any previous family connection to Fargo or North Dakota. Pember began work immediately at his new job. Shapiro testified she attempted but was unable to find permanent work within her field, although she did earn a second master's degree during this time.

[¶ 6] The marriage became strained in 2008, and Pember sued for divorce at the end of September. A judicial referee awarded interim joint physical and legal custody of the three children during the pendency of the proceedings.

[¶ 7] Following trial, the district court awarded sole physical custody of the children to Shapiro. Pember retained joint legal custody with Shapiro. He was granted extended visitation as well as monthly visitation, certain holidays, and weekly communication with the children. The court also ordered Pember to pay $2,080 per month in child support. In dividing the parties' assets, the district court refused to enforce the premarital agreement, finding Pember's execution of the document "was not knowing and voluntary." The court divided the assets and debts of the parties on the basis of the testimony and evidence at trial. Shapiro was awarded 62% of the marital estate and Pember was awarded 38%, which the district court

---

1. The Legislature amended N.D.C.C. ch. 14–09 during the 2009 session. Effective August 1, 2009, the terms "custody" and "visitation" were replaced by "primary residential responsibility" and "parenting time." This case was originally filed prior to this change, so our opinion follows the district court in using the old terminology.

explained was "justified because Lauren brought an increased amount of property into the marriage." The court amended its judgment in May 2010, eliminating all spousal support and reducing Pember's child support obligation to $1,741. Pember appeals from this amended judgment.

[¶ 8] On appeal, Pember argues the court's award of sole physical custody of the parties' children to Shapiro was clearly erroneous, along with the order allowing Shapiro to relocate with the children. He also contends the court erred in calculating his child support obligation. Shapiro cross-appeals, arguing the premarital agreement should have been enforced. Alternatively, she contends the court erred in its equitable division of the marital estate.

[¶ 9] The district court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. § 27–05–06. Pember's appeal was timely under N.D.R.App.P. 4(a). This Court has jurisdiction under N.D. Const. art. VI, §§ 2 and 6, and N.D.C.C. § 28–27–01.

## II

[¶ 10] Pember argues the district court's decision to award Shapiro sole physical custody of the parties' children was clearly erroneous.

[¶ 11] A district court's custody award is a finding of fact that will not be reversed on appeal unless it is clearly erroneous. *Edwards v. Edwards*, 2010 ND 2, ¶ 7, 777 N.W.2d 606. A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, on the entire evidence, we are left with a definite and firm conviction that a mistake has been made. *Id.* Questions of law are subject to full review. *Slorby v. Slorby*, 2009 ND 11, ¶ 4, 760 N.W.2d 89.

[¶ 12] In an initial custody decision, the district court must award custody of the children to the parent who will better promote their best interests and welfare. *Marsden v. Koop*, 2010 ND 196, ¶ 9, 789 N.W.2d 531. The district court must consider the best interest factors of N.D.C.C. § 14–09–06.2(1) in deciding what is in the best interests of the child. *Frueh v. Frueh*, 2009 ND 155, ¶ 10, 771 N.W.2d 593. These factors include:

a. The love, affection, and other emotional ties existing between the parents and child.

b. The capacity and disposition of the parents to give the child love, affection, and guidance and to continue the education of the child.

c. The disposition of the parents to provide the child with food, clothing, medical care, or other remedial care recognized and permitted under the laws of this state in lieu of medical care, and other material needs.

d. The length of time the child has lived in a stable satisfactory environment and the desirability of maintaining continuity.

e. The permanence, as a family unit, of the existing or proposed custodial home.

f. The moral fitness of the parents.

g. The mental and physical health of the parents.

h. The home, school, and community records of the child.

i. The reasonable preference of the child if the court deems the child to be of sufficient intelligence, understanding, and experience to express a preference.

j. Evidence of domestic violence . . . .

k. The interaction and interrelationship, or the potential for interaction and interrelationship, of the child with any person who resides in, is present, or frequents the household of a parent and

who may significantly affect the child's best interests. The court shall consider that person's history of inflicting, or tendency to inflict, physical harm, bodily injury, assault, or the fear of physical harm, bodily injury, or assault, on other persons.

l. The making of false allegations not made in good faith, by one parent against the other, of harm to a child as defined in section 50–25.1–02.

m. Any other factors considered by the court to be relevant to a particular child custody dispute.

N.D.C.C. § 14–09–06.2(1).[2] The district court found factors b, c, and k favored Shapiro, while factors d and e favored Pember. The remaining factors favored neither parent.

### A

[¶ 13] Pember argues the district court's findings on factor h are clearly erroneous. Factor h concerns the home, school, and community records of the children. The district court explained, "The boys have exhibited some recent behavioral concerns; however, these appear to be temporary and influenced by the finalization of this divorce. This factor favors neither parent." Pember contends this finding is clearly erroneous because the children were excelling in the Fargo area. Testimony and other evidence at trial showed they were involved in many activities, were performing well academically, and had developed friendships and ties to the community. In addition, Pember argues Shapiro's plan for relocation should be considered against her because she did not know the specific community and school the children would move to if she relocated with them.

[¶ 14] While there is evidence that reflects the children are doing well in the Fargo area, the record contains other evidence that the children would respond positively to a move with Shapiro. According to Shapiro, she was the one who was generally in charge of establishing routines for the children, researching and enrolling the children in activities, and doing day-to-day tasks such as helping with homework and bringing them to appointments. Pember testified that Shapiro was the one who selected the children's daycare and their doctors and that Shapiro was responsible for raising them in their Jewish faith. Pember further testified that the Longfellow School, in which the boys were excelling academically, was chosen by Shapiro, who "did all the research" prior to the family's move to Fargo.

[¶ 15] Viewed in totality, we cannot say the district court's findings on factor h were clearly erroneous. The district court found the children have already experienced significant relocations in their young lives, within Kansas and from Kansas to North Dakota, and the parties testified the children responded positively after each of these moves. The court also found that Shapiro was responsible for locating and choosing the children's schools and daycare and that she was the children's primary caretaker. These findings were relevant and important considerations in the assessment of this factor.

[¶ 16] We also recognize, however, there is no evidence to suggest that the children would not continue to thrive if they remained in the Fargo area. The testimony and evidence at trial show that the children have excelled in their schools and in the community. Their positive re-

---

**2.** This is the version of N.D.C.C. § 14–09–06.2(1) existing prior to the 2009 amendments. It is quoted here because it governs this case, which was filed before these amendments took effect.

sponses to past moves and Shapiro's history of care, however, were reasonably considered by the district court in assessing this factor. Accordingly, the district court's finding that factor h favored neither party is not clearly erroneous.

### B

[¶ 17] Pember argues the district court's finding that factor k favored Shapiro was clearly erroneous because she does not know specifically what city or state she will move to. Factor k contemplates potential beneficial interactions the children may have with others who reside in, are present in, or who frequent the household of a parent and may significantly affect the best interests of the children. After finding that neither party had ties to North Dakota or any non-family members living in their households, the district court explained:

> If Lauren were to receive custody and were allowed to move to the New York/New Jersey area, she would be much closer to her family and parents. Indeed, this is one of the reason[s] she wants to relocate. If this were to happen, undoubtedly the children would have much more interaction with their maternal grandparents and Lauren's "support net" would be greatly expanded. This factor slightly favors Lauren.

[¶ 18] While it is true that Shapiro had not made definite plans for her intended move, the district court found she intended to move "both because of employment opportunities and to be closer to her family." Shapiro testified she is from New York and her parents continue to live there. She also testified she had received two job offers in the state of New Jersey, one at a preschool and another at a different school. She told the court she had multiple interviews at a college in Brooklyn and

was anticipating their making a hiring decision soon.

[¶ 19] Shapiro may not have been certain about where she would relocate, but her testimony reflects she was deciding between a small number of locations based on specific job offers. All of these potential locations would bring the children much closer to Shapiro's family than their remaining in North Dakota. The district court found that such a move would greatly increase the children's "support net" over their current situation in North Dakota, where no extended family members reside or regularly visit. On the basis of the testimony presented, the district court's finding that this factor favored Lauren because of increased family interactions with the children was not clearly erroneous.

[¶ 20] The district court's consideration of the best interest factors of N.D.C.C. § 14–09–06.2(1) reflected a reasonable consideration of the testimony and evidence presented. Its decision to award sole physical custody of the children to Shapiro is affirmed.

### III

[¶ 21] Pember argues the district court erred as a matter of law in considering N.D.C.C. § 14–09–07(1), which governs a custodial parent's request to move the children to another state.

[¶ 22] A custodial parent's ability to move with her children out of state is governed by N.D.C.C. § 14–09–07(1): "A parent entitled to the custody of a child may not change the residence of the child to another state except upon order of the court or with the consent of the noncustodial parent, if the noncustodial parent has been given visitation rights by the de-

cree."[3] Pember contends the district court erred in its amended judgment by allowing Shapiro to relocate with the children to the New York–New Jersey area when she had not been granted sole physical custody of the children.

■ [¶ 23] We use a four-factor test in assessing a custodial parent's request to move to another state with her children. These factors were originally established in *Stout v. Stout,* 1997 ND 61, ¶ 34, 560 N.W.2d 903, and the fourth factor was clarified in *Hawkinson v. Hawkinson,* 1999 ND 58, ¶ 9, 591 N.W.2d 144. The current *Stout–Hawkinson* test consists of these four factors:

1. The prospective advantages of the move in improving the custodial parent's and child's quality of life,
2. The integrity of the custodial parent's motive for relocation, considering whether it is to defeat or deter visitation by the noncustodial parent,
3. The integrity of the noncustodial parent's motives for opposing the move,

. . . .

4. The potential negative impact on the relationship between the noncustodial parent and the child, including whether there is a realistic opportunity for visitation which can provide an adequate basis for preserving and fostering the noncustodial parent's relationship with the child if relocation is allowed, and the likelihood that each parent will comply with such alternate visitation.

*Dvorak v. Dvorak,* 2006 ND 171, ¶ 13, 719 N.W.2d 362.

■ [¶ 24] We have held that it is not appropriate for a district court to consider the *Stout–Hawkinson* factors alone when the existing custody award was for joint

physical custody. *Maynard v. McNett,* 2006 ND 36, ¶ 21, 710 N.W.2d 369. "[T]he *Stout–Hawkinson* factors are incapable of addressing the issue fully, and the statutory factors provided in N.D.C.C. § 14–09–06.2 must be used to decide which primary custody arrangement will serve the best interests of the child." *Id.* The issue Pember raises is whether the court's application of the *Stout–Hawkinson* factors was impermissible because the court had not previously made its award of initial custody. Stated another way, Pember contends the court could not consider the *Stout–Hawkinson* factors and make the initial custody award in the same judgment.

[¶ 25] This Court noted in *Stout* the inevitability of cases such as this one in which an initial primary custody determination would necessarily have to be made before ruling on a parent's request to relocate. *Stout,* 1997 ND 61, ¶ 54 n. 7, 560 N.W.2d 903. We have explained the district court "may consider the intention of the parent making the motion to relocate with the child in judging the child's best interests. . . ." *McNett,* 2006 ND 36, ¶ 21, 710 N.W.2d 369. The district court should not ignore this information when it must consider "all factors affecting the best interests and welfare of the child." *See* N.D.C.C. § 14–09–06.2(1); *see also Schneider v. Lascher,* 72 A.D.3d 1417, 899 N.Y.S.2d 479, 481 (2010) ("[M]other's relocation is a very important factor among the constellation of factors to be considered in arriving at a best interests determination.") (quotation omitted).

[¶ 26] In its amended judgment, the district court ordered, "Lauren shall have sole physical custody of [the children]. Further, the Court having considered the

---

**3.** This is the version of N.D.C.C. § 14–09–07(1) existing prior to the 2009 amendments. It is quoted here because it governs this case, which was filed before these amendments took effect.

[*Stout–Hawkinson* factors], it is in the best interests of the children that Lauren be allowed to relocate to the New York / New Jersey area and is allowed to do so." This statement is a summary of the district court's more detailed findings, which were explained in its order for judgment following the trial. In its order, the district court began by noting, "In making an award of custody, the Court is required to consider the statutory best interest factors contained in Section 14–09–06.2 of the North Dakota Century Code, and the Court has considered those factors as follows[.]" The district court proceeded with an analysis of each of the thirteen factors in N.D.C.C. § 14–09–06.2 in making its initial custody award. As part of this analysis, the district court considered Shapiro's intended move in its consideration of factors e and k, as it is permitted to do under N.D.C.C. § 14–09–06.2. *See also McNett*, 2006 ND 36, ¶ 21, 710 N.W.2d 369. The *Stout–Hawkinson* factors, as such, were not considered during the initial custody determination. This is reflected not only in the district court's findings, but also in the court's factor d discussion when it noted that the *Stout–Hawkinson* factors would be addressed later in the order. After discussing all thirteen factors in N.D.C.C. § 14–09–06.2, the district court concluded that "[b]ased upon the evidence presented at trial, and after considering all the above-factors," Shapiro should be awarded sole physical custody.

[¶ 27] Only after completing its best interests of the children analysis did the district court begin its consideration of Shapiro's relocation request using the *Stout–Hawkinson* factors. The court again clarified the distinction between the factors in its custody decision and its consideration of Shapiro's proposed move: "In addition to a normal custody decision, Lauren has requested to move the children with her out of the state of North Dakota and to the New York/New Jersey area, pursuant to Section 14–09–07 of the North Dakota Century Code...." The court then proceeded with an analysis of the four factors in the *Stout–Hawkinson* test.

[¶ 28] Pember's argument focuses solely on the permissibility of the district court's consideration of the *Stout–Hawkinson* factors in an order which also contained the initial custody decision. The district court acted properly by considering Shapiro's relocation request after it had awarded sole physical custody of the children to her using the best interests factors. Shapiro's proposed cross-country move significantly affects some of those factors, so it was proper for the court to consider this planned move in making its initial custody award. *See McNett*, 2006 ND 36, ¶ 21, 710 N.W.2d 369. We note that other jurisdictions permit a trial court to act as the district court did here, by making an initial custody decision and then considering a parent's relocation request in the same judgment. *See Valkoun v. Frizzle*, 973 A.2d 566 (R.I.2009); *In re Luis*, 18 Misc.3d 650, 847 N.Y.S.2d 835 (N.Y.Fam. Ct.2007). The district court did not err by doing the same. We hold the district court acted properly in considering the *Stout–Hawkinson* relocation factors after it had awarded Shapiro sole physical custody of the children in accordance with N.D.C.C. § 14–09–06.2.

IV

[¶ 29] Pember argues the district court erred in its calculation of his child support obligation. The district court used the child support guidelines set forth by the North Dakota Department of Human Services. These guidelines are administrative rules established under N.D.C.C. § 14–09–09.7 and have the force and effect of law. *In re D.L.M.*, 2004 ND

38, ¶ 6, 675 N.W.2d 187. "A court errs as a matter of law when it fails to comply with the requirements of the child support guidelines in determining an obligor's child support obligation." *Lauer v. Lauer*, 2000 ND 82, ¶ 3, 609 N.W.2d 450. The district court's findings of fact will not be overturned unless they are clearly erroneous, though the court is required to clearly set forth how it arrived at the amount of income and level of support. *Id.*

### A

[¶ 30] Pember contends the district court erred by limiting his downward adjustment for extended visitation to the months in which the visitation actually occurs. The district court stated, "Pursuant to section 75–02–04.1–08.1 of the North Dakota Administrative Code, Dale shall be entitled to an adjustment to the child support amount for the period of his extended summer visitation. For that period, Dale shall pay Lauren a total child support amount of $1,647." Pember is entitled to this downward deviation under N.D. Admin. Code § 75–02–04.1–08.1(1) because his extended visitation will last "at least 65 straight days."

[¶ 31] The rules of statutory construction are applied to the interpretation of administrative rules. *Gofor Oil, Inc. v. State*, 427 N.W.2d 104, 108 (N.D.1988). We begin by looking at the plain language of the rule to interpret its intent. N.D.C.C. § 1–02–05. Section 75–02–04.1–08.1, N.D. Admin. Code, provides:

1. For purposes of this section, "extended visitation" means visitation between an obligor and a child living with an obligee scheduled by court order to exceed sixty of ninety consecutive nights or an annual total of one hundred sixty-four nights.

2. Notwithstanding any other provision of this chapter, if a court order provides for extended visitation between an obligor and a child living with an obligee, the support obligation presumed to be the correct child support amount due on behalf of all children of the obligor living with the obligee must be determined under this subsection.

a. Determine the amount otherwise due under this chapter from the obligor for those children.

b. Divide the amount determined under subdivision a by the number of those children.

c. For each child, multiply the number of that child's visitation nights times .32 and subtract the resulting amount from three hundred sixty-five.

d. Divide the result determined under subdivision c by three hundred sixty-five.

e. Multiply the amount determined under subdivision b times each decimal fraction determined under subdivision d.

f. Total all amounts determined under subdivision e.

Nothing in the plain language of the rule restricts the downward deviation for extended visitation to the months in which the visitation occurs. On the contrary, the rule's use of the "three hundred sixty-five" figure in calculating the child support obligation reflects that the entire year is to be considered. Under the plain language of N.D. Admin. Code § 75–02–04.1–08.1, the downward deviation should have been credited to Pember for the entire year.

[¶ 32] The summary of comments at the public hearings on the amendments to Chapter 75–02–04.1 of the North Dakota Administrative Code is consistent with our plain language interpretation. Regarding section 75–02–04.1–08.1, the summary states, "The proposed new section actually operates to reduce the child support obli-

gation for periods of time the child spends with the obligor. The reduction appears smaller because *it is in effect the entire year*, rather than just during the time the visitation is occurring." *Summary of Comments Received in Regard to Proposed Amendments to N.D. Admin. Code Ch. 75–02–04.1 Child Support Guidelines* at 37 (emphasis added). The district court departed from the child support guidelines by limiting the downward deviation in Pember's support obligation to the months of actual visitation. This departure was incorrect as a matter of law, and we reverse and remand to the district court to recalculate Pember's downward deviation for the entire year, consistent with N.D. Admin. Code § 75–02–04.1–08.1.

### B

[¶ 33] Pember argues the district court erred in calculating his child support obligation because it incorrectly stated his net income. Net income must be determined in calculating the support obligation under N.D. Admin. Code § 75–02–04.1–02(3).

[¶ 34] Pember submitted a child support guidelines worksheet to the district court. This worksheet allows the parent and the court to consider the parent's various income sources and deductions in calculating his net income and monthly support obligation. The worksheet Pember submitted arrived at a monthly net income of $4,898 and a monthly support obligation of $1,539 per month. The district court, however, stated in its amended judgment that Pember's monthly net income was $5,146.42. There is no indication or explanation of how the court arrived at this figure, but it used this amount in calculating Pember's support obligation to be $1,741 per month.

[¶ 35] Without more information, we cannot discern whether the court's or Pember's support calculation is more accurate. "[A] proper finding of net income is essential to determine the correct amount of child support under the child support guidelines...." *Berge v. Berge,* 2006 ND 46, ¶ 8, 710 N.W.2d 417. "As a matter of law, the district court must clearly set forth how it arrived at the amount of income and level of support." *Lauer,* 2000 ND 82, ¶ 3, 609 N.W.2d 450. The district court failed to provide a sufficient explanation of how it calculated Pember's net income. We reverse and remand to the district court to establish a more detailed calculation of Pember's net income and his child support obligation.

### C

[¶ 36] Pember argues the district court erred by not granting a downward deviation in his child support obligation on the basis of travel expenses he will incur in exercising his visitation rights.

[¶ 37] Section 75–02–04.1–09(2)(i), N.D. Admin. Code, provides that the presumed support obligation under the guidelines may be adjusted if it is in the best interests of the children and the obligor suffers a reduced ability to provide support due to travel expenses incurred while exercising visitation rights. While the child support guidelines allow a district court to grant a downward deviation for travel expenses, the exercise of this power is discretionary. *See Graner v. Graner,* 2007 ND 139, ¶ 20, 738 N.W.2d 9 ("[T]ravel expenses *can* be the basis for a downward deviation from the presumptive child support....") (emphasis added). Using Pember's own calculation of income and travel expenses, the district court could reasonably conclude that his ability to provide child support would not be hindered by his travel costs and that reducing his support obligation would not be in the best interests of the children. Further, while Pember is responsible for the costs of his visi-

tation, Shapiro must pay for the children's travel expenses to and from their extended visitation with Pember. The district court judgment reflects a reasonable consideration of the travel expenses involved for all parties, and we affirm the decision to deny a downward deviation of Pember's support obligation on this basis.

### V

[¶ 38] Shapiro cross-appeals, arguing the court erred in its division of the parties' assets. When a divorce is granted, the district court is required to make an equitable distribution of the parties' property and debts. N.D.C.C. § 14–05–24. Division of property by the district court is a finding of fact that will be disturbed only if it is clearly erroneous. *Amsbaugh v. Amsbaugh*, 2004 ND 11, ¶ 21, 673 N.W.2d 601. Questions of law are subject to full review. *Slorby*, 2009 ND 11, ¶ 4, 760 N.W.2d 89.

### A

[¶ 39] Shapiro argues the district court erred by invalidating the premarital agreement the parties signed on their wedding day. "The substantive enforceability of a premarital agreement is a matter of law to be decided by the court." *Sailer v. Sailer*, 2009 ND 73, ¶ 21, 764 N.W.2d 445.

[¶ 40] The testimony of both parties reflects that very little planning preceded the creation of the premarital agreement. Pember testified that in the brief time between their decision to marry and the actual ceremony, they never discussed entering into such an agreement. According to Shapiro, the parties made their decision to sign a premarital agreement at the urging of her mother. Shapiro's testimony showed that all material decisions regarding the agreement were made mere hours before they were actually married. The lawyer who drafted the

agreement did not receive any information regarding the parties' property until the morning of the wedding. Pember was not advised to seek independent legal advice, and there was not time to do so. "[L]ack of adequate legal advice to a prospective spouse to obtain independent counsel is a significant factual factor in weighing the voluntariness of a premarital agreement." *Binek v. Binek*, 2004 ND 5, ¶ 8, 673 N.W.2d 594 (quotation omitted).

[¶ 41] Shapiro testified that in the span of less than five hours, the parties were pressed to execute an entire premarital agreement from scratch, go through a wedding ceremony with the justice of the peace, eat lunch, and get to the bank before it closed at 1:00. While this hectic schedule in itself does not invalidate the agreement's enforceability, it is a strong indicator of the haphazard manner in which this agreement was put together. The parties' testimony reveals a scene in which they hurriedly gave the lawyer, hired by Shapiro, information that he used to draft the agreement. Shapiro testified she couldn't remember whether any modifications were made after it was drafted, but Pember stated there were none. Further, when asked whether she had discussed her premarital property with Pember beforehand, Shapiro testified, "I didn't actually talk to Dale about it. I just signed the contract." Pember's understandable confusion was obvious in his testimony, and he told the court he did not understand the agreement when it was signed or when asked about it at trial.

[¶ 42] Given the confusion surrounding the unfamiliar and inflexible terms in the agreement, as well as its rapid formation and execution, the parties were unable to give proper consent as required under N.D.C.C. § 9–01–02. We affirm the district court's decision and hold the premari-

tal agreement entered into by the parties is unenforceable.

## B

[¶ 43] Shapiro argues the district court erred in its equitable division of the parties' assets, because it did not consider alleged debts she owed to her mother and also failed to properly consider Pember's spending of marital assets during the pendency of the divorce.

[¶ 44] At trial, Shapiro claimed the parties owed her mother money for loans she had made to them to cover expenses. When pressed for information about these debts, Shapiro was unable to provide specifics. No promissory notes were produced, and her mother's deposition, which purportedly described the circumstances surrounding these loans, was never offered into evidence. Given the almost total lack of specificity surrounding these purported debts, the district court did not err by excluding them from its equitable division of property.

[¶ 45] Further, Shapiro's contention that Pember improperly spent marital assets during the pendency of the divorce appears to be without merit. On the basis of the testimony and evidence, it appears Pember's financial conduct was at the least no more questionable than Shapiro's, which the district court found to be "naive at best and dishonest at worst." Accordingly, Shapiro's cross-appeal is denied.

## VI

[¶ 46] We affirm the district court's award of sole physical custody of the children to Shapiro, its decision to allow her to relocate with the children, and its equitable division of the parties' marital assets. We remand to the district court to recalculate Pember's child support obligation, specifically to establish his net income and adjust his downward deviation for extended visitation in accordance with this opinion.

[¶ 47] GERALD W. VANDE WALLE, C.J., DANIEL J. CROTHERS, MARY MUEHLEN MARING and CAROL RONNING KAPSNER, JJ., concur.